**Opinion issued May 23, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00245-CR

———————————

## MICHAEL CARSON ANDERSON, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 208th District Court**
**Harris County, Texas**
**Trial Court Case No. 1312318**

---

## O P I N I O N

Appellant, Michael Carson Anderson, was charged by indictment with

aggravated robbery.[1]  Appellant pleaded not guilty.  A jury found him guilty.

---

[1]  *See* TEX. PENAL CODE ANN. §§ 29.02(a)(2), 29.03(a)(2) (Vernon 2011),
§ 31.03(a), (b)(1) (Vernon Supp. 2012).

Appellant pleaded true to two enhancement paragraphs, and the trial court assessed punishment at 40 years' confinement. In three issues, appellant argues (1) he received ineffective assistance of counsel, (2) the appeal should be abated for findings of fact and conclusions of law, and (3) the trial court erred by denying his motion to suppress an impermissibly suggestive photographic array.

We affirm.

## Background

Michelle Fuoss was working as a bartender at the Litehouse Ice House in Spring, Texas on June 23, 2011. She arrived shortly after 11:00 in the morning to open the bar and get everything ready. Not long after she opened the bar, a man came in, explaining he was waiting for a friend to show up. He came in and out of the bar a couple of times. Eventually, he sat down and struck up a conversation with Fuoss about how much the bar had changed. When Fuoss opened the register to put the money in, the man walked around the bar, put a gun to her head, and told her to give him the money. She complied. The man took the business's telephone, Fuoss's purse, and the money, and left.

Fuoss notified the police, and provided a description of the robber. The police also obtained copies of the surveillance video. Officer V. Cook, then of the Harris County Sheriff's Office, released images from the surveillance video to the media and later received an anonymous tip from Crime Stoppers identifying

appellant as the possible robber. Officer Cook looked at a photograph in her database of appellant. In the photograph, appellant had a bald head, a goatee, and a tattoo on his neck. Officer Cook determined that he had features similar to the description of the robber from Fuoss as well as to the images from the video surveillance of the bar. She then compiled pictures of other white males in the same approximate age range who also had bald heads, and tattoos on the neck or upper chest. Two others, like the photo of appellant, had facial hair. Three did not. Officer Cook testified that she was limited in her choices based on the features but nevertheless was able to compile the array.

Officer Cook presented the array to Fuoss while Fuoss was at her mother-in-law's house. She explained to Fuoss that "a suspect had been developed and that I had prepared a photo array that I would like her to take a look at." Before presenting Fuoss with the photo array, Officer Cook provided her a list of written instructions. Fuoss reviewed and signed the instruction sheet before she reviewed the photographic array. Among other things, the instruction sheet explained that she "should not conclude or guess that the photographs contain a picture of the person who committed the crime" and that she was "not obligated to identify anyone." Fuoss explained at the hearing on appellant's motion to suppress, "I was under the impression that I didn't even have to pick a photo." Finally, Fuoss was

3

presented with the array. After reviewing it for about two minutes, Fuoss picked appellant, stating that she was about 95% sure that appellant was the robber.

Fuoss's mother-in-law was present in the room while Fuoss reviewed the instructions and array. Officer Cook, Fuoss, and Fuoss's mother-in-law all testified during the suppression hearing that the mother-in-law did not comment on the photographs, gesture in any suggestive way, or in any other way influence Fuoss's identification of appellant in the array. It was undisputed that the mother-in-law was not present during the robbery and had no personal knowledge about the identity of the robber.

During the voir dire of the venire panel at trial, the prosecutor discussed the meaning of the beyond-a-reasonable-doubt burden of proof. Specifically, she said, "There is no definition for beyond a reasonable doubt, but you can use your own common sense to decide for yourself what it is. You're supposed to use your common sense, your life experiences, your education to weigh the evidence. That's the point of being a juror." Appellant did not object to this explanation or otherwise complain about the characterization at trial.

## Ineffective Assistance of Counsel

In his first issue, appellant argues he received ineffective assistance of counsel.

4

## A. Standard of Review & Applicable Law

The Sixth Amendment to the United States Constitution guarantees the right to reasonably effective assistance of counsel in criminal prosecutions. *See* U.S. CONST. amend. VI. To show ineffective assistance of counsel, a defendant must demonstrate both (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S. Ct. 2052, 2064, 2068 (1984); *Andrews v. State*, 159 S.W.3d 98, 101–02 (Tex. Crim. App. 2005). Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *See Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *Andrews*, 159 S.W.3d at 101.

An appellant bears the burden of proving by a preponderance of the evidence that his counsel was ineffective. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Id.* at 814. We presume that a counsel's conduct falls within the wide range of reasonable professional assistance, and we will find a counsel's performance deficient only if the conduct is so outrageous that no competent attorney would have engaged in it. *Andrews*, 159 S.W.3d at 101.

5

The Court of Criminal Appeals has recently stated that "[i]n making an assessment of effective assistance of counsel, an appellate court must review the totality of the representation and the circumstances of each case without the benefit of hindsight." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). The court further stated that demonstrating ineffective assistance of counsel on direct appeal is "a difficult hurdle to overcome." *Id.* The court instructed, "[T]he record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Id.*

**B.    Analysis**

Appellant argues that he received ineffective assistance of counsel during voir dire of the venire panel when his attorney failed to object to a statement made by the prosecutor to the venire panel. While she was asking the venire panel questions, the prosecutor discussed the meaning of the beyond-a-reasonable-doubt burden of proof. Specifically, she said, "There is no definition for beyond a reasonable doubt, but you can use your own common sense to decide for yourself what it is. You're supposed to use your common sense, your life experiences, your education to weigh the evidence. That's the point of being a juror."

Appellant argues that the State impermissibly lowered its burden of proof by telling the venire that they could use their common sense in deciding whether there

6

was proof beyond a reasonable doubt. Due to his trial attorney's failure to object, which prevented appellant from fully presenting the issue on appeal, appellant argues that he received ineffective assistance of counsel. Because we conclude that there was no error in the prosecutor's statement, we hold that his attorney's performance was not insufficient by failing to object.

In Texas, courts are not required to give the jury a definition of beyond a reasonable doubt. *Rogers v. State*, 795 S.W.2d 300, 306 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd). Instead, it is meant to be understood in its common meaning. *Id.* To that end, "each juror must decide for himself what amount of proof would constitute the threshold of beyond a reasonable doubt." *Murphy v. State*, 112 S.W.3d 592, 597 (Tex. Crim. App. 2003) (citing *Garrett v. State*, 851 S.W.2d 853, 859 (Tex. Crim. App. 1993) (holding "an individual juror must determine what proof beyond a reasonable doubt means to him, for the law does not tell him")). It follows from this body of law that the jurors must use their common sense in determining whether proof beyond a reasonable doubt has been met. *See Rogers*, 795 S.W.2d at 306 (holding statement to jurors was not erroneous because "[t]he trial court was merely telling the jurors to use their common sense").

A prosecutor's statement to the venire panel that they would have to use their common sense to decide what constitutes proof beyond a reasonable doubt,

7

then, is not erroneous. Accordingly, appellant's counsel's assistance was not deficient by failing to object to the statement. *See Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996) (holding "in order to argue successfully that . . . counsel's failure to object . . . amounted to ineffective assistance, appellant must show that the trial judge would have committed error in overruling such an objection").

Appellant relies on *Wansing v. Hargett*, a Tenth Circuit habeas corpus case, to support his contention that the prosecutor's statement was inappropriate. 341 F.3d 1207 (10th Cir. 2003). In *Wansing*, the trial court's comments regarding the meaning of reasonable doubt "implied that there [wa]s an extraordinarily broad range of possible meanings, including some which are plainly unconstitutional, and informed the jurors that they had to resolve the definitional issue for themselves, in the 'individuality' of their own 'conscience and reason.'" *Id.* at 1214. *Wansing* applies Oklahoma law. *Id.* Under Texas law, however, jurors must decide what proof beyond a reasonable doubt means to them. *Murphy*, 112 S.W.3d at 597. The prosecutor's comments were therefore consistent with Texas law. *See Haro v. State*, 371 S.W.3d 262, 265–66 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (distinguishing *Wansing*).

We overrule appellant's first issue.

**Photographic Array**

In his third issue, appellant argues the trial court erred by denying his motion to suppress an impermissibly suggestive photographic array. In his second issue, appellant argues we should abate the appeal and remand the case to the trial court for findings of fact and conclusions of law relevant to the photographic array.

**A.      Standard of Review**

We review a trial court's ruling on a motion to suppress using a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). Although we give almost total deference to the trial court's determination of historical facts, we conduct a de novo review of the trial court's application of the law to those facts. *Id.* At a hearing on a motion to suppress, the trial court is the sole trier of fact and judge of the credibility of the witnesses as well as the weight to be given their testimony. *Smith v. State*, 236 S.W.3d 282, 289 (Tex. App.—Houston [1st Dist.] 2007 pet. ref'd). The trial court may choose to believe or disbelieve all or any part of a witness's testimony. *Id.* On appeal, we review the evidence in the light most favorable to the trial court's ruling. *Id.*

**B.      Abatement**

In his second issue, appellant argues we should abate the appeal and remand the case to the trial court for findings of fact and conclusions of law relevant to the

photographic array. Appellant acknowledges that he did not request findings of fact and conclusions of law when the trial court denied his motion to suppress.

The Court of Criminal Appeals held in *State v. Ross* that "when the trial court fails to file findings of fact, we view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record." 32 S.W.3d 853, 855 (2000). Later, in *State v. Cullen*, the court held that, "upon the request of the losing party on a motion to suppress evidence, the trial court . . . . must make findings of fact and conclusions of law adequate to provide an appellate court with a basis upon which to review the trial court's application of the law to the facts." 195 S.W.3d 696, 699 (Tex. Crim. App. 2006). It clarified the limitation of this holding, however. "If the non-prevailing party fails to make the request, and the trial court does not enter findings of fact and conclusions of law of its own accord, . . . . our opinion in *Ross* will continue to control." *Id.*

Appellant's argument for why we should abate the proceedings and remand the case to the trial court for findings of fact and conclusions of law when they were not previously requested is contrary to the body of law set out above. We hold the trial court was not obligated to file findings of fact and conclusions of law without a proper request. We overrule appellant's second issue.

10

## C.     Analysis

In his third issue, appellant argues the trial court erred by denying his motion to suppress an impermissibly suggestive photographic array. Officer Cook, who compiled and presented the array, testified during the suppression hearing that she had received a crime stoppers tip that appellant might be the robber. She looked at a photograph in her database of appellant. In the photograph, appellant had a bald head, a goatee, and a tattoo on his neck. Officer Cook determined that he had features similar to the description of the robber from Fuoss as well as to the images from the video surveillance of the bar. She then compiled pictures of other white males in the same approximate age range who also had bald heads, and tattoos on the neck or upper chest. Two others, like the photo of appellant, had facial hair. Three did not. Officer Cook testified that she was limited in her choices based on the features but nevertheless was able to compile the array.

Officer Cook presented the array to Fuoss while Fuoss was at her mother-in-law's house. She explained to Fuoss that "a suspect had been developed and that I had prepared a photo array that I would like her to take a look at." Before presenting Fuoss with the photo array, Officer Cook provided her a list of written instructions. Fuoss reviewed and signed the instruction sheet before she reviewed the photographic array. Among other things, the instruction sheet explained that she "should not conclude or guess that the photographs contain[ed] a picture of the

11

person who committed the crime" and that she was "not obligated to identify anyone." Fuoss explained at the hearing on appellant's motion to suppress, "I was under the impression that I didn't even have to pick a photo." Finally, Fuoss was presented with the array. After reviewing it for about two minutes, Fuoss picked appellant, stating that she was about 95% sure that appellant was the robber.

Fuoss's mother-in-law was present in the room while Fuoss reviewed the instructions and array. Officer Cook, Fuoss, and Fuoss's mother-in-law all testified during the suppression hearing that the mother-in-law did not comment on the photographs, gesture in any suggestive way, or in any other way influence Fuoss's identification of appellant in the array. It was undisputed that the mother-in-law was not present during the robbery and had no personal knowledge about the identity of the robber.

The Due Process Clause of the Fourteenth Amendment of the United States Constitution protects an accused from the admission of a pretrial identification into evidence if it is "so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law." *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995). "When challenging the admissibility of a pretrial identification, an accused has the burden to show, based on the totality of the circumstances and by clear and convincing evidence, that (1) the pretrial identification procedure was impermissibly

suggestive and (2) it created a substantial likelihood of irreparable misidentification." *Sierra v. State*, 266 S.W.3d 72, 75 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) (citing *Barley*, 906 S.W.2d at 32–33).

Appellant relies on what are referred to as the *Biggers* factors to argue the photo array should have been suppressed. *See Neil v. Biggers*, 409 U.S. 188, 199, 93 S. Ct. 375, 382 (1972). These factors are weighed against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances. *Loserth v. State*, 963 S.W.2d 770, 772 (Tex. Crim. App. 1998). In other words, they are relevant to the second factor of whether the impermissibly suggestive identification procedure created a substantial likelihood of irreparable misidentification. *See id.* at 772 (analyzing trial court's admission of in-court identification of defendant following an impermissibly suggestive pretrial photographic identification); *Sierra*, 266 S.W.3d at 76 (analyzing *Biggers* factors under second prong of pretrial identification test). These factors are not relevant, then, to the initial determination of whether the pretrial identification procedure was, in fact, impermissibly suggestive. It is to this first element that we now turn.

Appellant argues that three factors rendered Fuoss's pretrial identification of him impermissibly suggestive. First, appellant argues that the photographic array did not provide good comparison subjects. Second, appellant argues that the investigator's statement to Fuoss that a suspect had been developed and an array

13

had been put together as a result was impermissibly suggestive. Finally, appellant argues that Fuoss's mother-in-law's presence in the room during the review of the array created a "subtle pressure" on Fuoss.

Taking appellant's last point first, there is no support in the record for appellant's theory of "subtle pressure" on Fuoss by the presence of her mother-in-law. Officer Cook, Fuoss, and Fuoss's mother-in-law all testified at the suppression hearing. All of them testified that the mother-in-law did not comment on the photographs, gesture in any suggestive way, or in any other way influence Fuoss's identification of appellant in the array. Appellant's claim that "Fuoss would not want to disappoint her mother-in-law by failing to help the police through identification of someone already believed by the police to be a suspect" is pure conjecture.

Likewise, we find no support for appellant's claim that the comparison subjects were not sufficiently similar to appellant. Appellant's complaint that each person has some distinguishing characteristics from him is insufficient to establish that the array was impermissibly suggestive. "Neither due process nor common sense requires that the individuals in a lineup exhibit features exactly matching the accused. Rather, a photo array must contain individuals who fit a rough description of the suspect." *Colgin v. State*, 132 S.W.3d 526, 532 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (internal citations omitted).

14

All of the individuals in the photographic array are white males who appear to be roughly the same age as appellant as he is depicted in the picture. All of them are bald. All of them appear to have some tattoos on their neck or upper chest. Three of them, including appellant, have facial hair. We hold that each of the individuals in the photographic array fits a rough description of appellant, the robber as described by Fuoss, and the image of the robber in the surveillance video.

Finally, we find no error in Officer Cook's explanation to Fuoss that a suspect had been developed and that the array had been created as a result. "The fact that an eyewitness knows that the police have developed a suspect does not by itself make a line-up impermissibly suggestive so as to give rise to a substantial likelihood of irreparable misidentification." *Hughes v. State*, 962 S.W.2d 689, 696 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd) (citing *Webb v. State*, 760 S.W.2d 263, 272 (Tex. Crim. App. 1988)). This is especially true when the witness was told that she was under no obligation to pick anyone out of the line-up and that the suspect might or might not be present. *See id.*

We overrule appellant's third issue.

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Bland.

Publish.   TEX. R. APP. P. 47.2(b).

16