**Opinion issued March 6, 2014**



In The

# Court of Appeals

For The

## First District of Texas

_____

**NO. 01-13-00398-CR**
_____

**MARK ANTHONY TILLMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1285679**

---

**O P I N I O N**

Appellant, Mark Anthony Tillman, was charged by indictment with capital

murder.[1]  Appellant pleaded not guilty.  The jury found him guilty.  Appellant was

---

[1]  *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp. 2013).

sentenced to life imprisonment. In one issue on appeal, appellant argues the evidence was insufficient to establish that he intended to commit murder.

We affirm.

## Background

Complainant, Euland Laster, was found bleeding and lying in the street in a residential neighborhood in Houston, Texas on November 10, 2010. The bleeding was a result of blunt-force trauma that Laster had received. He was taken in an ambulance to a hospital but died before he arrived. Laster was 65.

Police investigators determined Laster's credit card and car had been stolen. In the course of their investigation, they were contacted by Timka Carper. Carper was a friend of Kendrick Jacobs's. The day after Laster was attacked, Jacobs told Carper of his involvement in the crime. Jacobs called appellant on his cell phone, using the speaker to hear appellant. Carper heard the conversation. In it, appellant acknowledged hitting Laster. Appellant asserted he did not try to kill Laster. Laster had been calling for help, and appellant explained he hit Laster because he wanted him to be quiet. Appellant stated that Laster was moving too slow to get away. He admitted that he did not know if Laster had died or not. Carper told the police what she heard in the conversation.

The investigators also obtained information on the crime from appellant's mother and brother. Following that meeting, on November 17, 2010, Officer D.

2

Arnold and Officer Lovelace went to the Ben Taub Neuropsychiatric Center, where appellant had earlier checked himself in voluntarily. Appellant met with Officers Arnold and Lovelace. Appellant admitted to his involvement in the crime, including hitting Laster with a hammer. Appellant described it as a hard plastic or fiberglass hammer. Appellant again asserted, however, that he did not intend to kill Laster.

At trial, Dr. M. Anzalone, a medical examiner, testified that Laster had been hit ten times with a blunt object. The injuries were consistent with blows from a hammer. Two of the blows were on one of Laster's legs. Three were on his back. One was on his back shoulder. Another was on his clavicle, which broke as a result of the impact. One was on his chest, with another on his chest consistent with a blow from the claw portion of a hammer. Finally, one blow was to the head, causing a fracture of the skull. Dr. Anzalone testified that the injuries to the head "would be consistent with a significant amount of force." Each of these blows caused blood loss.

Dr. Anzalone also determined that Laster had "very severe and very significant" heart disease. She testified that the heart disease along with the blood loss resulting from the blows from the hammer were contributing factors for Laster's death. During direct examination, the prosecutor asked, "If [Laster] had not had heart disease, could it have been possible that he could have survived these

injuries?" Dr. Anzalone replied, "Yes." During cross examination, she explained that, if Laster had not had heart disease, that "doesn't necessarily mean that he wouldn't have died." Instead, "[t]there is no way to know precisely" how significant Laster's heart disease was in his death.

Dr. M. Wheeler, the Chairman of the Department of Pathology and Immunology at Baylor College of Medicine, testified for appellant. He agreed that Laster had "very severe" heart disease that "involve[d] all three of the major vessels." The left anterior descending coronary artery—which Dr. Wheeler testified was commonly referred to as "the widow maker" for heart disease—was 85% narrowed. Another artery was 50% narrowed, and the third was 90% narrowed.

Dr. Wheeler testified, "Even though [Laster] may have been walking around and appeared normal, his severe underlying heart disease made him, in effect, a walking time bomb." He explained that, when a person is attacked, this triggers an adrenaline rush. The adrenaline increases the work of the heart and, for people with heart disease, can lead to heart complications. If the blood vessels cannot accommodate the increased flow of blood, the oxygen necessary for the heart to function properly cannot reach the heart, which leads to an irregular heartbeat, or arrhythmia. Once the heart chambers are not beating in rhythm, "there is no blood supply being given to the rest of the body; and the patient dies."

4

Dr. Wheeler also testified that the estimated amount of blood that Laster lost was "not a fatal thing in and of itself" for a person without heart disease. But for someone like Laster, "it can be a devastating condition to lose that much blood when you have that underlying heart disease." Dr. Wheeler testified that if Laster "had been younger or not had heart disease, I would suspect that those injuries would not have been fatal."

After Wheeler's testimony, the State recalled Dr. Anzalone. She testified that she did not disagree with Dr. Wheeler.

## Intent to Commit Murder

In his sole issue, appellant argues the evidence was insufficient to establish that he intended to commit murder.

### A.     Standard of Review

We review the sufficiency of the evidence establishing the elements of a criminal offense for which the State has the burden of proof under a single standard of review. *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013) (citing *Brooks* v. *State,* 323 S.W.3d 893, 895 (Tex. Crim. App. 2010)). This standard of review is the standard enunciated in *Jackson* v. *Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). Pursuant to this standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the

verdict, no rational fact finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson,* 443 U.S. at 319, 99 S. Ct. at 2789; *In re Winship*, 397 U.S. 358, 361, 90 S. Ct. 1068, 1071 (1970); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We can hold evidence to be insufficient under the *Jackson* standard in two circumstances: (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or (2) the evidence conclusively establishes a reasonable doubt. *See Jackson*, 443 U.S. at 314, 318 & n.11, 320, 99 S. Ct. at 2786, 2789 & n.11; *see also Laster*, 275 S.W.3d at 518; *Williams*, 235 S.W.3d at 750.

The sufficiency-of-the-evidence standard gives full play to the responsibility of the fact finder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton* v. *State,* 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court presumes that the fact finder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson,* 443 U.S. at 326, 99 S. Ct. at 2793. In viewing the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.

6

*Clayton,* 235 S.W.3d at 778. Finally, the "cumulative force" of all the circumstantial evidence can be sufficient for a jury to find the accused guilty beyond a reasonable doubt. *See Powell* v. *State,* 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).

**B.      Analysis**

As it pertains to appellant, "[a] person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder in the course of committing . . . robbery. . . ." TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp. 2013). Murder as defined by section 19.02(b)(1) of the Texas Penal Code is "intentionally or knowingly caus[ing] the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2011). Because section 19.03(a)(2) requires the murder to be committed intentionally, the "knowingly" mens rea in section 19.02(b)(1) is not available to support a conviction. *Demouchette v. State*, 731 S.W.2d 75, 80 (Tex. Crim. App. 1986). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2011).

Appellant asserted that he did not intend to kill Laster but only meant to make him be quiet. The jury was free to disbelieve this evidence. *See Johnson v.*

*State*, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984) (holding "jury, sitting as the trier of facts, may accept or reject any or all of the testimony adduced"). Disbelief of certain testimony, however, cannot stand in as proof of the opposite of that testimony. *Id.*; *see also Wright v. State*, 603 S.W.2d 838, 840 (Tex. Crim. App. 1980) (holding "disregard[ing] the appellant's testimony does not mean that the missing elements of the offense are supplied by rejecting this testimony").

The State argues that the jury could have inferred the intent to kill from the use of a deadly weapon. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) (holding "the jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon"). We cannot agree that this line of legal reasoning applies in this circumstance.

The Texas Penal Code includes two definitions of what constitutes a deadly weapon. First, a deadly weapon is "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (Vernon Supp. 2013). Second, a deadly weapon is also "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B).

All of the cases that the State relies on to argue that an inference to support an intent to kill can be drawn by the use of a deadly weapon are cases in which the

8

weapon was a deadly weapon under the first definition. *See Jones*, 944 S.W.2d at 647 (defendant used .357 revolver); *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993) (defendant brought loaded gun into bank). It is certainly reasonable to allow a jury to infer that a person who used something "manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury" intended to kill the person on whom the weapon was used.

In contrast, the second definition of what can cause a deadly weapon encompasses anything that is *capable* of causing death or serious bodily injury in the manner of its use. TEX. PENAL CODE ANN. § 1.07(a)(17)(B); *see also Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008) (noting State is only required to show use or intended use is *capable* of causing death or serious bodily injury). The possibilities for what fits within this definition are almost limitless. *See, e.g.*, *Tucker*, 274 S.W.3d at 691 (unknown object, possibly a key); *Turner v. State*, 664 S.W.2d 86, 90 (Tex. Crim. App. 1983) (hands or knees); *Kennedy v. State*, 402 S.W.3d 796, 802 (Tex. App.—Fort Worth 2013, no pet.) (television set); *but see* *Mosley v. State*, 545 S.W.2d 144, 145–46 (Tex. Crim. App. 1976) (holding BB gun did not fit definition of "deadly weapon" when expert testified that its projectiles could not penetrate skin). Under this definition of deadly weapon, "the injuries suffered by the victim can by themselves be a sufficient basis for inferring that a deadly weapon was used." *Tucker*, 274 S.W.3d at 691–92.

9

If any object is used in a manner that ultimately brings about a person's death, then, the object can be inferred to be a deadly weapon. *See id.* If we adopted the State's reasoning and allow a further inference in this circumstance that intent to commit murder can be inferred by use of the deadly weapon, we would, in effect, allow the jury to infer the intent to kill from the bare fact that the victim died. Allowing such an inference would excuse the State from meeting its burden of showing that defendants in these circumstances *intentionally* committed murder. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). We cannot reach such a conclusion. *See* TEX. CODE CRIM. PROC. ANN. art. 38.03 (Vernon Supp. 2013) (mandating presumption of innocence and requiring each element of offense to be proved beyond reasonable doubt).

A hammer is not manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury. *Cf. Charleston v. State*, 33 S.W.3d 96, 99 (Tex. App.—Texarkana 2000, pet. ref'd) (holding wrench is not deadly weapon per se). It is a deadly weapon in this circumstance because it was used in a manner "capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B). Accordingly, the State cannot rely on an inference that, because he used a deadly weapon, appellant intended to commit murder.

This is not to say, however, that the circumstances of Laster's death and the nature of the injuries inflicted by appellant cannot be a basis for the jury to infer

10

appellant's intent. Undoubtedly, they can. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (holding "[i]ntent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant"); *Cordova v. State*, 698 S.W.2d 107, 112 (Tex. Crim. App. 1985) (holding "jury may find the specific intent to kill from the circumstances accompanying the use of the weapon"); *Powell,* 194 S.W.3d at 507 (holding "cumulative force" of all circumstantial evidence can be sufficient for jury to find accused guilty beyond a reasonable doubt). Instead, we hold only that the State cannot rely on the use of a deadly weapon in this circumstance to establish an inference of intent to commit murder.

Turning to the circumstances of Laster's death and the nature of the injuries inflicted by appellant, we acknowledge, as appellant argues, that the circumstantial proof of intent is somewhat clouded by the fact that Laster's heart disease played at least some role in his death. There is no indication in the record that appellant had any way of knowing Laster's heart condition or how it would weaken Laster's ability to withstand an attack that another man of the same age might be able to survive. Nevertheless, the evidence does establish that appellant struck Laster in the head with a hammer.[2] The only description of the hammer came from

---

[2] The medical examiner testified that it was not possible to determine the order in which any of the strikes occurred. Accordingly, nothing in this opinion should be read to suggest an order of progression.

11

appellant. Appellant told the police officers who questioned him that it was either a hard plastic or fiberglass hammer. The blow was forceful enough to fracture appellant's skull, an amount of force that the medical examiner described as significant. In addition, the evidence establishes that appellant hit Laster twice in the chest. Both were in approximate vicinity of the heart. One of the blows was likely caused by the claw portion of the hammer. A fourth blow was to the left clavicle with enough force to break it.

The totality of the circumstances establishes that appellant delivered a blow to the head significant enough to fracture Laster's skull, two blows to the chest near the heart—including a gouging blow with the claw end of the hammer—and a fourth blow in an area directly in between the head and chest. In addition, appellant hit Laster six additional times on the back and legs.

Furthermore, there is evidence in the record that appellant stated afterwards that he did not know if Laster lived or died. This indicates that appellant was aware that he was delivering blows sufficiently hard to enough sensitive areas that he could have killed Laster. We hold, then, that the cumulative force of all of this evidence can support an inference by the jury that appellant intended to kill Laster. Accordingly, we hold that there was sufficient evidence in the record for the jury to have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson,* 443 U.S. at 319, 99 S. Ct. at 2789.

12

We overrule appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.

Laura Carter Higley
Justice

Panel consists of Justices Jennings, Higley, and Sharp.

Publish.  TEX. R. APP. P. 47.2(b).