**Opinion issued March 8, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00628-CR

———————————

**DARRELL DWAYNE BROUSSARD, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 183rd District Court**
**Harris County, Texas**
**Trial Court Case No. 1330029**

---

## MEMORANDUM OPINION

Darrell Dwayne Broussard appeals his conviction for capital murder. He argues that he is entitled to a new trial because:

(1)    law enforcement officers secured witness testimony identifying him as one of the armed robbers through an impermissibly suggestive photo array in violation of his right to due process;

(2)     the trial court's charge unlawfully allowed the jury to return a non-unanimous verdict by instructing it that it could find Broussard guilty based on either of two different theories of the underlying robbery;

(3)     there is insufficient evidence to prove capital murder; and

(4)     the trial court erred by excluding in part the testimony of a defense expert regarding the shortcomings of eyewitness identifications.

We affirm Broussard's conviction.

## Background

Ahmad Issaoui died from multiple gunshot wounds suffered in the course of the robbery of an illegal gaming room where he was employed as a security guard. A grand jury indicted Broussard for the capital murder of Issaoui.

Most of the facts of Issaoui's murder and the robbery were undisputed at the jury trial. Issaoui was shot four times at close range and died from these injuries. Ballistics evidence indicates that he was shot with two or more semiautomatic pistols. The manager of the game room, Luis Trelles, testified without contradiction that both of the gunmen he encountered at the scene demanded that he tell them where the money was located and that one of these gunmen took about $1,500 from a back office and about another $1,000 from him. There also was unrebutted testimony that Issaoui's firearm was stolen.

The sole dispute at trial was whether Broussard was one of the gunmen. No DNA or fingerprint evidence ties Broussard to the crime scene. The evidence connecting him to the robbery and murder consists of Trelles's eyewitness

identification. Trelles testified that he was in a back office when he heard two gunshots, which prompted him to enter the adjoining game room. When he came into the game room, he encountered a man emerging from the building's entry area where Issaoui had been stationed. This man pointed a gun at him and demanded to know where the money was located. After the gunman had taken the money located in the back office and on Trelles, he shot Trelles in the leg and returned to the back office. Trelles said he then heard another gunshot from the building's entry area and saw a second gunman enter the game room and demand to know where the remaining money was located. Trelles testified that both gunmen wielded semiautomatic pistols.

When law enforcement officers arrived on scene afterward, Trelles provided a description of these gunmen. Trelles later viewed a photo array compiled by Harris County Deputy Sheriff M. Quintanilla and identified Broussard as the gunman who shot him. He also identified Broussard in court. He testified that the game room was brightly lit and that the gunmen did not conceal their identities.

Broussard previously objected that Deputy Quintanilla's photo array was impermissibly suggestive. So before the trial court allowed Trelles to identify Broussard, in front of the jury, as the gunman who shot him, the trial court heard testimony outside the jury's presence from both Quintanilla and Trelles about the photo array and Trelles's identification of Broussard. Quintanilla acknowledged that

3

Trelles told him that the gunman who shot him was "a black male but not a real dark-skinned black male" and that three of the six men in the photo array "look darker" than the other three. But he clarified that these three men in the photo array appeared darker because the exhibit used at trial was a photocopy of the original array shown to Trelles. He testified these three images "are a whole lot lighter" in the original that was shown to Trelles. Trelles testified that he looked at the photo array for a "couple minutes, not too long" and then identified Broussard as the man who shot him. He stated that he was "pretty positive" he correctly identified Broussard as the shooter. When asked to assign a percentage to his degree of certainty, he said he was "99.9" percent certain. After hearing this testimony on the circumstances of the identification, the trial court overruled Broussard's objection.

Trelles then identified Broussard as the gunman who shot him in the leg. On cross-examination, Trelles conceded that he was "pretty shaken up" from being shot. He said that the robbery "[f]elt like an eternity" but only lasted "a few minutes." He did not recall how he sustained cuts on his head during the robbery and agreed that he may have lost consciousness at some point. He testified that Quintanilla showed him several photo arrays during the course of the investigation and acknowledged that he had been uncertain as to whether a couple of other men in these prior arrays might have been the man who shot him. The man who shot him had some facial hair, albeit not a beard, but he could not recall whether he told law enforcement officers

4

this detail. Additionally, Trelles recalled seeing some tattoos on the man who shot him and stated that he thought he had told law enforcement officers so. In the photo array, Broussard and only one other man had visible tattoos.

Deputy Sheriff Quintanilla testified that he showed Trelles several photo arrays over the course of the investigation and admonished Trelles before showing him the first one that there was not necessarily anyone in the array who committed the crime. He told Trelles that he was not obligated to identify anyone and it was just as important to clear innocent people as it was to identify guilty parties. He eventually showed Trelles an array that included Broussard, and Trelles identified Broussard as the man who had shot him. On cross-examination, Quintanilla testified that Trelles had not mentioned tattoos or a beard or goatee.

The defense called Dr. Trent Terrell, an associate professor of psychology at the University of Mary Hardin-Baylor, as an expert on eyewitness identification. Terrell has a doctorate in experimental psychology and his research concerns "[e]yewitness memory and the factors that affect its reliability." He testified about experiments he has conducted in which participants are shown an event—usually a simulated crime—and then brought back in after an interval and shown a photo array to test their memory accuracy. Terrell testified that memory is "reconstructive" and changes over time. He opined that a witness's confidence in his identification is not a reliable indicator of accuracy. He stated that there are ways to eliminate

5

suggestiveness in photo arrays and that one of the best ways is to ensure that the person conducting it also does not know who the suspect is in the array. Another way to reduce suggestiveness is to put as little pressure on the witness as possible to make an identification by instructing the witness that law enforcement will continue looking if the witness does not make an identification and that it is just as important to not pick the wrong person as it is to pick the right one. A sequential lineup is preferable to a simultaneous one in terms of eliminating false positives and does not entail much risk of reducing correct identifications.

With respect to this case in particular, Terrell testified that several variables had the potential to reduce the accuracy of Trelles's identification of Broussard, including the stress of the robbery, his gunshot wound and the pain it induced, the head injury and any associated loss of consciousness, the tendency to focus on a weapon rather than an attacker's face when a weapon is involved, and cross-racial identification bias. He also discussed the need for the others in a photo array to be similar to the suspect in appearance. In this array, only two of the six people had tattoos on their necks and these two individuals did not otherwise look alike because one had a lighter complexion and was standing in front of a different background than the others. He opined that all six should have had tattoos. He also testified that the fact that three of the others in the array were darker-skinned was "something that would be of importance." But he clarified that he was not testifying as to whether

Trelles's identification was accurate, just regarding some matters the jury should consider when assessing its accuracy.

On cross-examination, Terrell acknowledged that he had not spoken to Trelles. He also conceded that he had not spoken to Quintanilla regarding the identification procedure used in this case. He agreed that guidance published by the United States Department of Justice concerning photo arrays does not suggest that photo arrays are inappropriate. He also agreed that because Trelles was shown multiple photo arrays and had not identified suspects in some arrays, Trelles did not appear to have been pressured to make identifications. If Trelles had been admonished that the perpetrator may not be in the array, this admonishment was a good one. He agreed that he has no idea whether the true perpetrator was identified in this case. He did not review any of Trelles's medical records in connection with his head injuries. He also seemed to concede that no matter how the tattoo issue was resolved in the array, it would present difficulties because tattoos are "a no-win situation."

The trial court did not allow testimony from Terrell that the defense sought to introduce on two topics: (1) exonerations secured by the Innocence Project based on DNA evidence in cases in which convictions had been secured in part based on inaccurate eyewitness identifications and (2) the rates of error in eyewitness identifications that Terrell had documented when conducting his own experiments.

During a hearing outside the presence of the jury, Terrell testified that more than 300 exonerations have been secured by the Innocence Project based on DNA testing and that "[a]round 75% of these exonerated convictions were based at least in part on erroneous eyewitness identifications." He stated that he obtained the 300 figure from the Innocence Project's website but that he could not identify the individual cases because he does not "know all of them." His own experiments show that eyewitnesses make identification errors and that "depending on the variables introduced, the amount of errors fluctuate." When asked whether he had percentages, he testified, "It's difficult to get into percentages because all crime scenarios are different. . . . So, truthfully, no, I don't." He also stated, "I really don't like to get into percentages because it changes for every situation." Indeed, he could not state if the rate of error generally was above or below 50 percent. After hearing Terrell's proposed testimony on these two subjects, the trial court excluded it. It excluded the exoneration-related data on the basis that this testimony was irrelevant given the number of variables affecting exoneration, and it excluded the error-rate testimony on the basis that it too was irrelevant in light of the uncertainty of the data.

The defense also called Teresa Frank[1] as a witness. She testified that her husband told her that he had been involved in the game room robbery and that she had overheard a meeting at her house at which the robbery was discussed by her

---

[1] The witness is referred to by a pseudonym to protect her identity and privacy.

husband, his cousin, and two other men she did not recognize. She further testified that Broussard was not among the men at this meeting and that she had never previously seen him. But Frank did not know any of the details concerning the robbery and could not provide any identifying information regarding her husband's cousin beyond the name "Trey."

The State recalled Quintanilla in response to Frank's testimony. He testified that, after receiving information from Frank about her husband's possible involvement, he put a photo of her husband in a photo array and showed it to Trelles but that Trelles did not identify him. Quintanilla also testified that he determined that the meeting Frank overheard at her house concerned the robbery of another game room at another location, not the one at which Issaoui was killed and Trelles was shot.

The jury rendered a general verdict finding Broussard guilty of capital murder. The trial court assessed punishment at confinement for life.

**Suggestive Pretrial Identification**

Broussard contends that the pretrial photo array Quintanilla showed Trelles was impermissibly suggestive and tainted Trelles's in-court identification. He complains that the content of the photo array was impermissibly suggestive in that his appearance significantly differed from several of the others. He argues that three of the six men in the photo array had a darker complexion than him, despite Trelles's

description of the suspect as a black male with a light complexion. He also argues that, of the six men in the array, only he and one other had visible neck tattoos. These dissimilarities in the array, he argues, created a very substantial likelihood of misidentification, thereby denying him due process.

## A.    Standard of review and applicable law

A pretrial identification procedure, such as a photo array, may be "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968); *accord Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009); *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995). Whether the photo array was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification presents a mixed question of law and fact that does not turn on the evaluation of credibility and demeanor of the particular witnesses involved. *Burkett v. State*, 127 S.W.3d 83, 86 (Tex. App.—Houston [1st Dist.] 2003, no pet.). So we review this question de novo. *Thomas v. State*, 470 S.W.3d 577, 589 (Tex. App.—Houston [1st Dist.] 2015, pet. granted); *Burkett*, 127 S.W.3d at 86. This court applies a two-part test to determine whether a defendant's due-process rights were violated through the use of an impermissibly suggestive pretrial photo array. We first ascertain whether the array was impermissibly suggestive. *Simmons*, 390 U.S. at 384; *Barley*, 906 S.W.2d at 33; *Thomas*, 470 S.W.3d at 589; *Burkett*, 127 S.W.3d at

86. The defendant bears the burden of establishing by clear and convincing evidence that the pretrial photo array was impermissibly suggestive. *Burkett*, 127 S.W.3d at 86. If he carries this burden, we consider several non-exclusive factors in assessing whether the improper suggestiveness of the array corrupted the in-court identification to such an extent that it gave rise to a very substantial likelihood of irreparable misidentification. *Gamboa*, 296 S.W.3d 581–82; *Thomas*, 470 S.W.3d at 589; *Burkett*, 127 S.W.3d at 86–87.

A photo array may be rendered impermissibly suggestive either by the manner in which the array is presented to the witness by law enforcement officers or by the content of the array itself. *Burkett*, 127 S.W.3d at 87. In general, the content of a photo array may be suggestive if the suspect is the lone person included in the array who closely resembles the description given by a witness. *Id.* Due process does not, however, require that all of the persons in the array be identical in appearance. *Id.* It suffices if the photographs are of people who fit the rough description of the suspect. *Id.* Some differences in the appearance of individuals are inevitable and these generally will not render an array impermissibly suggestive if the persons included in the array are generally alike. *See Mims v. State*, 434 S.W.3d 265, 273 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (noting prior case in which pretrial lineup was held not impermissibly suggestive though height, weight, and skin tone of individuals varied); *Page v. State*, 125 S.W.3d 640, 646–47 (Tex. App.—Houston

[1st Dist.] 2003, pet ref'd) (stating that "a photographic array is not impermissibly suggestive merely because each photograph can be distinguished in some manner from the photograph of the accused"); *see, e.g.*, *Anderson v. State*, 414 S.W.3d 251, 258–59 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (array in which only three of six men had facial hair, including defendant, not impermissibly suggestive); *Colgin v. State*, 132 S.W.3d 526, 532 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (array not suggestive although three men were heavier than defendant); *Withers v. State*, 902 S.W.2d 122, 125 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (inclusion of two bearded men in lineup with clean-shaven defendant did not make lineup suggestive); *Escovedo v. State*, 902 S.W.2d 109, 117 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (array not suggestive even though only one other person in array had a tattoo and facial hair similar to defendant).

## B. Photo array was not impermissibly suggestive

Quintanilla showed Trelles eight separate photos arrays, each of which contained six individuals, during the course of the investigation. Broussard argues that the inclusion of three black males with a darker complexion than his in the final array was impermissibly suggestive, given that Trelles had described the gunman who shot him as having a light complexion. Quintanilla initially conceded that three men in the final array that included Broussard "look darker" than the other three, but clarified that they appeared darker because the exhibit was a photocopy. He testified

that these three images "are a whole lot lighter" in the original that Trelles was shown. Both the original and the copy of the array were introduced into evidence. They corroborate Quintanilla's testimony.

Broussard also argues that the array was impermissibly suggestive because only he and one other person displayed visible neck tattoos. But he concedes that there is some uncertainty as to whether Trelles told Quintanilla that the gunman had neck tattoos before he was shown the array. At trial, Trelles testified that he recalled seeing some tattoos on the gunman and that he thought he had told law enforcement officers so when he described the gunman. Quintanilla testified that Trelles did not mention tattoos.

Neither the differences in the complexions of the men in the array nor the fact that only two had visible neck tattoos, whether considered alone or taken together, rendered the photo array suggestive. The differences in skin tone are not suggestive given the rough similarity of the individuals included—all black males with short black hair and some facial hair in the same basic age range. *See Mims*, 434 S.W.3d at 273 (citing prior case in which pretrial lineup was held not impermissibly suggestive despite variations in skin tone of individuals). Likewise, the mere fact that only Broussard and one other had visible neck tattoos did not render the final array impermissibly suggestive, particularly given the conflict in the evidence as to whether Quintanilla was aware that the suspect had such a tattoo when the array was

shown to Trelles. *See Escovedo*, 902 S.W.2d at 117 (array not suggestive where only one other person in the array had tattoo similar to the defendant's). Additionally, Trelles did not pick Broussard from a single six-person photo array. He was shown several arrays before identifying Broussard. We hold that Broussard has not carried his burden to show by clear and convincing proof that the pretrial photo array in which Trelles identified him as the gunman was impermissibly suggestive.

We overrule Broussard's first issue.

## Unanimity of Jury Verdict

Broussard contends that the trial court erred by submitting a charge that allowed the jury to render a non-unanimous general verdict. He maintains that the charge improperly instructed the jury that it could find him guilty of capital murder if either it found that Issaoui was slain (1) in the course of being robbed or (2) in the course of Trelles being robbed, without agreeing as to which man had been robbed. Broussard argues that this disjunctive instruction was erroneous because these two scenarios constitute two distinct criminal offenses, rather than alternate methods of committing a single offense. In other words, Broussard contends that the jury had to be unanimous regarding the murder of Issaoui and whether Issaoui was murdered while he was being robbed or murdered in the course of a robbery perpetrated on Trelles, but the jury charge permitted a verdict of guilty without this required unanimity.

14

## A. Standard of review and applicable law

In deciding whether an erroneous jury charge requires reversal, we first assess whether the charge was erroneous. *Santee v. State*, 247 S.W.3d 724, 726–27 (Tex. App.—Houston [1st Dist.] 2007, no pet.). If it was erroneous, we then consider whether the error was harmful. *Id.* at 727.

Texas requires unanimous verdicts in felony cases. *See* TEX. CONST. art. V, § 13; *Santee*, 247 S.W.3d at 727. In general, however, unanimity is required solely with respect to the essential elements of an offense. *Renteria v. State*, 199 S.W.3d 499, 508 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). If a criminal statute sets forth different modes or means by which an offense may be committed, the jury generally does not need to be unanimous with respect to the alternate modes or means of commission. *Id.*; *see, e.g.*, *Woodard v. State*, 294 S.W.3d 605, 608–09 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (aggravated robbery; concluding that "the aggravating factors in this case are simply descriptions or means by which the underlying offense of robbery by causing bodily injury can be committed" and that unanimity on these factors therefore was not required). In such instances, a trial court may submit these alternate theories of the offense to the jury in the disjunctive, and the jury may render a general verdict of guilty if the proof suffices to support this finding under any of the theories submitted. *Bogany v. State*, 54 S.W.3d 461, 463 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). In contrast, a trial court errs

15

if it disjunctively charges the jury on separate offenses and allows the jury to render a single, general guilty verdict. *Fulenwider v. State*, 176 S.W.3d 290, 299 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd). So, for example, a charge permitting a jury to convict a defendant of a single murder, regardless of whether the jury believes that he killed one person or another, is erroneous because each killing is a separate offense about which the jury must be unanimous. *See id.* (discussing *Hisey v. State*, 129 S.W.3d 649 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd)).

The Court of Criminal Appeals has addressed disjunctive jury charges in the context of capital murder. In *Gamboa*, it held that a disjunctive charge is permissible in capital murder cases "so long as the same victim is alleged for the predicate murder." 296 S.W.3d at 584. The court concluded that this held true for "all alternate theories of capital murder" contained within the statute and that the disjunctive submission of any of these alternate theories of the offense does not violate the unanimity requirement. *Id.* at 583–84. In other words, a jury need not "be unanimous on which of the two underlying felonies the defendant was in the course of committing." *Gardner v. State*, 306 S.W.3d 274, 302 (Tex. Crim. App. 2009). Thus, it is permissible for a trial court to submit a single capital murder jury charge "containing alternate underlying offenses that are the same statutory offense but with different victims or different underlying methods of commission, so long as the same

16

victim is alleged with respect to the predicate murder." *Davis v. State*, 313 S.W.3d 317, 342 (Tex. Crim. App. 2010).

**B.    Jury charge did not permit a non-unanimous jury verdict**

Broussard contends that, in order to find him guilty of the capital murder of Issaoui, a jury must unanimously agree regarding whether the murder occurred while robbing Issaoui or Trelles. Broussard's position has been rejected by the Court of Criminal Appeals. *Gardner* clearly states that juries do not need to "be unanimous on which of the two underlying felonies the defendant was in the course of committing." 306 S.W.3d at 302. His position cannot be reconciled with *Davis*'s equally clear statement that the jury charge in a capital murder case may contain "alternate underlying offenses that are the same statutory offense but with different victims." 313 S.W.3d at 342. The gravamen of capital murder is intentionally or knowingly causing the death of another, and it is this subject that requires unanimity. *Gardner*, 306 S.W.3d at 302. Accordingly, we hold that the trial court did not err in charging the jury in the disjunctive with respect to the underlying robberies of Issaoui and Trelles.

We overrule Broussard's second issue.

## Sufficiency of the Evidence

The trial court instructed the jury that it could find Broussard guilty of capital murder under any one of three theories: he murdered Issaoui in the course of the

robbery; he encouraged his confederates to do so in the course of the robbery; or he conspired to commit robbery and should have anticipated Issaoui's murder. Broussard contends that the evidence is not sufficient to support a conviction under any of these theories.

## A.    Standard of review and applicable law

In assessing complaints about the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to ascertain whether a rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jones v. State*, 458 S.W.3d 625, 630 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd). The jurors alone are the judges of the facts, the weight to be accorded testimony, and the credibility of the witnesses. *Id.* They may reject any part of a witness's testimony, whether it is contradicted by other evidence or not. *Id.* We afford almost complete deference to the jurors' weight and credibility determinations, will not substitute our judgment for theirs, and resolve any inconsistencies in the proof in favor of their verdict. *Id.* The proof "is insufficient under four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere 'modicum' of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; or (4) the acts alleged do not constitute the criminal offense

charged." *Ryser v. State*, 453 S.W.3d 17, 25 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd).

In reviewing the evidence, circumstantial proof is treated no differently than direct proof, and circumstantial proof can suffice to establish an alleged perpetrator's identity and a defendant's guilt. *Jones*, 458 S.W.3d at 630–31; *Carmon v. State*, 456 S.W.3d 594, 604 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). It is not necessary that each fact point directly and independently to the defendant's guilt, so long as the cumulative force of all the incriminating circumstances is sufficient to support a conviction. *Jones*, 458 S.W.3d at 630. Lack of DNA or fingerprint evidence does not affect the sufficiency of the proof. *Pena v. State*, 441 S.W.3d 635, 641 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). And the testimony of a single witness can be sufficient evidence to support a conviction. *Shah v. State*, 414 S.W.3d 808, 812 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd); *Santiago v. State*, 425 S.W.3d 437, 443 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

A person commits capital murder if he intentionally or knowingly causes the death of an individual in the course of committing or attempting to commit a number of underlying offenses, including robbery. TEX. PENAL CODE § 19.02(b)(1) (West 2011); TEX. PENAL CODE § 19.03(a)(2) (West Supp. 2015). If causing death is the person's conscious objective or desire, then his conduct is intentional; if the person is aware that death is reasonably certain to result from his conduct, then it is

knowing. TEX. PENAL CODE § 6.03(a)–(b) (West 2011). Jurors may infer an intent to kill from a defendant's use of a weapon manifestly designed for the purpose of inflicting death or serious bodily injury. *Tillman v. State*, 426 S.W.3d 836, 841 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). When a person discharges a firearm at close range and death results, the law presumes it was his intent to kill. *Ervin v. State*, 333 S.W.3d 187, 200 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). A person commits the underlying offense of robbery if he (1) intentionally, knowingly, or recklessly causes bodily injury to another or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death, in the course of unlawfully appropriating property, with an intent to deprive the owner of it and obtain or maintain control of it himself. TEX. PENAL CODE §§ 29.02(a) (West 2011); TEX. PENAL CODE § 31.03(a) (West Supp. 2015). Display of a firearm constitutes a threat of imminent bodily injury or death. *Ceasar v. State*, 661 S.W.2d 256, 258 (Tex. App.—Houston [1st Dist.] 1983, no pet.).

A person may be guilty of capital murder either as a principal actor or a party to the offense. TEX. PENAL CODE §§ 7.01–.02 (West 2011). A person is criminally responsible as a principal actor if he commits the offense. *Id.* § 7.01(a). A person may be criminally responsible for a murder committed by another as a party to the offense under a variety of circumstances, including situations in which he intends to promote or assist in the commission of the offense and he solicits, encourages,

directs, aids, or attempts to aid another person to commit the offense. *Id.* § 7.02(a)(2). Likewise, if in an attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are criminally responsible for the actual felony committed without reference to their intent, so long as the actual felony was committed in furtherance of the unlawful purpose and should have been anticipated as a result of carrying out the conspiracy. *Id.* § 7.02(b). A defendant's participation as a party to a criminal offense may be inferred from the circumstances and does not require direct proof. *Trenor v. State*, 333 S.W.3d 799, 807 (Tex. App.—Houston [1st Dist.] 2010, no pet.). When the trial court's charge authorizes the jury to convict on more than one theory of criminal responsibility, a guilty verdict will be upheld if the proof is sufficient on any one of the theories submitted. *Id.*

**B.    The proof is sufficient for capital murder**

Broussard argues that the "strongest of the theories in the jury charge" was that he "committed the robbery of Trelles and was hence a party to the murder of Issaoui." But he contends that this theory of party liability depends on proof that he was in fact the gunman who shot Trelles and that the sole proof of this fact consists of Trelles's eyewitness identification. Broussard maintains that there was no other evidence linking him to the robbery or murder and notes the absence of DNA or fingerprint evidence in particular. On its face, Broussard's position is untenable. The

21

testimony of a single eyewitness can be sufficient evidence. *Jones*, 458 S.W.3d at 630–31; *Carmon*, 456 S.W.3d at 604. Neither DNA nor fingerprint evidence is required, and the absence of such evidence does not affect the sufficiency of the proof that is in the record. *Pena*, 441 S.W.3d at 641.

At trial, the evidence showed that Issaoui died from four gunshot wounds. He was shot with two or more semiautomatic pistols at close range. Trelles testified that he was in a back office when he heard two gunshots These prompted him to enter the adjoining game room where he encountered a man, whom he later identified as Broussard, emerging from the building's front entry area where Issaoui had been stationed. Broussard pointed a gun at him and demanded to know where the money was located, took money located in the back office and on Trelles' person, and shot Trelles in the leg. Trelles testified that Broussard used a semiautomatic pistol. This proof suffices to permit a rational jury to find Broussard guilty beyond a reasonable doubt of capital murder as a party to the offense.

We overrule Broussard's third issue.

## Exclusion of Expert Testimony

Broussard contends that the trial court erred by partially excluding the testimony of his expert, Dr. Terrell. He argues that Terrell should have been allowed to testify about exonerations obtained by the Innocence Project in cases in which the convictions had been secured with the aid of mistaken eyewitness identifications as

22

well as the error rates in eyewitness identifications made in his experiments. Broussard maintains that this testimony would have assisted the jury in assessing the reliability of Trelles's eyewitness identification of Broussard and that its exclusion therefore was an abuse of discretion.

## A. Standard of review and applicable law

We review a trial court's decision to exclude expert testimony for abuse of discretion. *Baldree v. State*, 248 S.W.3d 224, 228 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). If its ruling is subject to reasonable disagreement, we will uphold it. *Id.* The proponent of expert testimony must show by clear and convincing evidence that the testimony is sufficiently relevant and reliable to assist the jury in understanding other evidence or in deciding a fact at issue. *Id.* Accordingly, in order to be admissible, an expert must tie the facts of the case to the scientific principles about which he proposes to testify. *Id.* In *Tillman v. State*, 354 S.W.3d 425 (Tex. Crim. App. 2011), the court held that an expert psychologist's testimony on eyewitness identification was admissible. *Id.* at 434–43. The expert there "articulately described specifics when asked to do so" and "tied the relevant facts of the case to the scientific principles about which he testified." *Id.* at 437–38. If an expert on eyewitness identification fails to do so or his testimony otherwise fails to satisfy the prerequisites for the admission of expert testimony in a given case, it is inadmissible. *See Blasdell v. State*, 470 S.W.3d 59, 61–66 (Tex. Crim. App. 2015)

(affirming exclusion of expert testimony about effect of "weapon focus" on accuracy of eyewitness identification on basis that reliability of scientific principles at issue was not proven by clear and convincing evidence); *Baldree*, 248 S.W.3d at 230 (affirming exclusion of expert testimony on eyewitness identification because defendant did not show that expert's "opinions related to any of the specific facts of this case" or could assist the jury "other than in the most general sense").

**B.    Trial court did not abuse its discretion by excluding this testimony**

The trial court permitted Dr. Terrell to testify as an expert on eyewitness memory and the factors that affect its reliability. But it excluded his testimony on two discrete topics: (1) exonerations obtained by the Innocence Project in cases in which convictions had been secured with the aid of mistaken eyewitness identifications and (2) the rate of error in eyewitness identifications made in experiments conducted by Terrell.

Outside the presence of the jury, Broussard's counsel elicited testimony from Terrell on both of these subjects. With respect to the Innocence Project exonerations, Terrell testified that more than 300 exonerations have been secured based on DNA testing and that "[a]round 75% of these exonerated convictions were based at least in part on erroneous eyewitness identifications." He stated that he had obtained the 300 figure from the Innocence Project's website but did not offer any testimony about individual cases or explain how they compared to the facts of this one.

24

Regarding the error rates in eyewitness identification in his own experiments, Terrell stated that "depending on the variables introduced, the amount of errors fluctuate." He could not state error rates in percentages due to the differences presented by each experiment. Indeed, he could not even say if the error rate was generally above or below 50 percent.

Terrell's testimony on exonerations obtained by the Innocence Project and the error rates in eyewitness identification in his own experiments is unconnected with the facts of Broussard's case. Terrell did not attempt to tie either topic to the case before the jury, and Broussard does not explain how Terrell's testimony on either topic would have aided the jury in understanding other evidence in the case or in deciding a fact at issue other than in the most general sense. Given this failure, we cannot say that the trial court abused its discretion by excluding Terrell's testimony on these two topics. *Baldree*, 248 S.W.3d at 230 (affirming exclusion of expert testimony on eyewitness identification because defendant did not show that expert's "opinions related to any of the specific facts of this case" or could assist the jury "other than in the most general sense").

We overrule Broussard's fourth issue.

## Conclusion

We affirm the trial court's judgment.

Harvey Brown
Justice

Panel consists of Justices Bland, Brown, and Lloyd.

Do not publish.  TEX. R. APP. P. 47.2(b).