**Opinion issued May 19, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00684-CV

———————————

## IN THE MATTER OF M.I.S., A JUVENILE

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2013-05802J**

---

## O P I N I O N

A jury found that M.I.S. had engaged in delinquent conduct by committing aggravated robbery. When the jury deadlocked on a second question asking it to determine whether M.I.S. used or exhibited a firearm in connection with the robbery, the trial court issued a supplemental instruction directing the jury that, if it could not reach unanimity on the question, to answer that M.I.S. did not. The trial

court entered affirmative findings pursuant to the jury's finding that M.I.S. had committed aggravated robbery, found that M.I.S. was in need of rehabilitation, and placed him in the custody of the Texas Juvenile Justice Department for ten years.

M.I.S. appeals, contending the trial court erred by (1) giving a supplemental instruction to the jury during its deliberations; (2) denying his motion to suppress the complainant's pretrial identification of M.I.S.; (3) admitting the complainant's in-trial identification of M.I.S.; and (4) denying M.I.S.'s motion for continuance. We affirm.

## BACKGROUND

Around nine in the evening in October 2013, Orlando Caval waited in a Marshall's store parking lot for his wife, who worked at the store. He sat inside his car in a lighted area near the store entrance. As he waited, another car pulled into the parking space on the passenger side of Caval's car. The female driver and the two male passengers, one wearing a hoodie sweatshirt with the hood pulled up, attracted Caval's attention. Caval rolled down his window, and the driver asked Caval for directions. In an effort to assist them, Caval began to search for a location on his cell phone. While Caval was looking at his phone, the passenger wearing the hoodie, later identified as M.I.S., exited the car and headed for Caval's car door. M.I.S. tried to open the door, but it was locked. Caval told M.I.S. to wait while Caval continued to search for directions.

M.I.S. went back to the other car and returned with a shotgun. He pushed the gun's barrel through the open window and held it, with his finger on the trigger, no more than 12 inches from Caval's head. The female driver then ordered Caval to leave his wallet and walk away from the car. As Caval walked away from his car and toward the store, he heard both cars drive away.

Caval called 9-1-1. A police officer arrived, and Caval described the three individuals involved. The day after the robbery, a witness identified Brenda Flores as a suspect. Sergeant S. Ashmore, the lead investigator in the case, proceeded to the district attorney's office to secure a warrant for Flores's arrest. On his way home from the district attorney's office, Sergeant Ashmore overheard some "radio traffic" about a burglary in progress nearby and headed to the scene. When Sergeant Ashmore arrived, he found that officers had taken M.I.S., Flores, and Neiman Gasper into custody for suspected commission of that burglary.

Sergeant Ashmore transported the three suspects to a police substation. He placed M.I.S. in a juvenile holding area while he conducted separate interviews with Flores and Gasper. Both Flores and Gasper identified M.I.S. as the gunman in the Caval carjacking. Later that day, Sergeant Ashmore showed Caval a photo array containing images of six men. Caval selected the photo of M.I.S. from the array and identified him as the person who held the gun to Caval's head. Caval

3

recounted that he was "very positive" of the identification. He also identified the other two assailants from photo arrays.

At trial, Caval testified that M.I.S. held the shotgun during the incident. The jury also heard testimony, however, that Gasper lied to police in stating that M.I.S. held the gun. On the witness stand, Gasper testified that he was the one who had the gun:

> Q. So on October 20th of 2013, you told Sergeant Ashmore that [M.I.S.], in Petitioner's Exhibit 149, which you were looking at the time, is the person who carjacked the man with the red car, right?
>
> A. I was lying.
>
> Q. Oh okay. So why is it that you were lying?
>
> A. Just talking.
>
> Q. You were pissed off?
>
> A. No, I was just talking. I was high.
>
> Q. So who did carjack the man in the red car?
>
> A. I jacked him.
>
> Q. So you had the gun that day?
>
> A. Yep.
>
> Q. And this is what you looked like that day, Petitioner's Exhibit 121?
>
> A. I don't know. Look like me.

The jury also heard testimony that the shotgun belonged to Brenda Flores.

M.I.S. raised no objection to the court's charge to the jury, which contained two questions. Question 1 asked for a finding of guilt or innocence on the

aggravated robbery charge. It instructed the jury to find that M.I.S. engaged in delinquent conduct if, beyond a reasonable doubt, it unanimously concluded either that:

> [M.I.S.] . . . while in the course of committing theft of property owned by ORLANDO CAVAL and with intent to obtain and maintain control of the property, intentionally OR knowingly threatened OR placed ORLANDO CAVAL in fear of imminent bodily injury OR death, and [M.I.S.] did then and there use or exhibit a deadly weapon, to wit: A FIREARM

or alternatively, that:

> BRENDA FLORES AND/OR NEIMAN GASPER, did then and there unlawfully, while in the course of committing theft of property owned by ORLANDO CAVAL and with intent to obtain and maintain control of the property, intentionally OR knowingly threaten OR place ORLANDO CAVAL in fear of imminent bodily injury OR death, and BRENDA FLORES AND/OR NEIMAN GASPER did then and there use OR exhibit a deadly weapon, to wit: A FIREARM, and that the respondent, [M.I.S.], with the intent to promote or assist the commission of the offense of AGGRAVATED ROBBERY, solicited, encouraged, directed, aided or attempted to aid to the other person or persons to commit the offense of AGGRAVATED ROBBERY, then you will find the respondent did engage in delinquent conduct of the offense of AGGRAVATED ROBBERY as charged in the petition.

Question 1 thus allowed the jury to affirmatively find that M.I.S. had committed the offense of aggravated robbery either as a primary actor or under the law of parties.

5

Question 2 asked the jury:

> Do you find from the evidence beyond a reasonable doubt that the respondent [M.I.S.] did then and there use or exhibit a deadly weapon, namely a firearm, during the commission of or during the immediate flight from the commission of the aggravated robbery alleged in the petition?

> After the jury retired to deliberate, it reported that it was

> Hopelessly deadlocked on Question No. 2.
> A, should we leave it blank; B, say deadlocked?"

In response, the trial court instructed the jury to refer to the general instruction concerning a unanimous verdict.

After the jury resumed deliberations the next day, the State moved the trial court to withdraw Question 2; M.I.S. moved for a mistrial. The trial court denied both motions. The State then asked for a supplemental instruction in connection with Question 2, which read:

> You are further instructed that if you cannot unanimously agree on an answer to this question, then you will state in your answer for Question No. 2, "We do not."

Over M.I.S.'s objection, the trial court submitted this supplemental instruction. Fifteen minutes later, the jury returned its verdict, finding M.I.S. guilty of aggravated robbery and answering "we do not" to whether it found that M.I.S. used or exhibited a deadly weapon. A poll of the jury revealed that the 12 jurors unanimously found M.I.S. guilty of aggravated robbery in response to Question 1,

and one out of the 12 jurors refused to find that M.I.S. had used or exhibited a deadly weapon in response to Question 2.

## DISCUSSION

### I.      Supplemental Jury Charge

M.I.S. contends that the supplemental instruction to Question 2—which told the jury to answer "we do not" if it could not unanimously find that M.I.S. used or exhibited a deadly weapon during the aggravated robbery—allowed the jury to reach a verdict based on a non-unanimous finding and caused harmful error.

#### A.      Standard of review

The Texas Rules of Civil Procedure generally govern the jury charge in juvenile proceedings. TEX. FAM. CODE ANN. § 56.01(b) (West Supp. 2015); *see In re L.D.C.*, 400 S.W.3d 572, 574 (Tex. 2013). But a juvenile proceeding is quasi-criminal; thus, criminal law precedent may be instructive in juvenile cases. *See In re C.O.S.*, 988 S.W.2d 760, 765–67 (Tex. 1999).

In reviewing a claim of jury charge error, we first decide whether there was error in the charge. *Ferguson v. State*, 335 S.W.3d 676, 684 (Tex. App.—Houston [14th Dist.] 2011, no pet.). If so, we evaluate whether sufficient harm resulted from the error to require reversal. *In re I.L.*, 389 S.W.3d 445, 449 (Tex. App.—El Paso 2012, no pet.) (citing *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994)).

M.I.S. preserved his objection to the supplemental instruction through timely objection. *See* TEX. R. APP. P. 33.1(a). To reverse the case based on jury charge error, therefore, we must find that the error, if any, caused some harm. *See* TEX. R. APP. P. 44.2; *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005).

### B.    Jury unanimity

Texas Family Code section 54.03(c) requires that "[j]ury verdicts under this title must be unanimous." TEX. FAM. CODE ANN. § 54.03(c) (West 2014); *In re L.D.C.*, 400 S.W.3d at 573. To meet the jury unanimity requirement, the jury must agree that the defendant committed one specific crime. *Landrian v. State*, 268 S.W.3d 532, 535 (Tex. Crim. App. 2008). The jury need not, however, find that the defendant committed that crime in one specific way or even with one specific act. *Id.*; *see Leza v. State*, 351 S.W.3d 344, 357 (Tex. Crim. App. 2011) (explaining that alleged theories of culpability as principal or party are merely alternate methods or means by which defendant committed one charged offense, which does not require juror unanimity); *Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004) (explaining that unanimity requirement is not violated when jury is instructed on alternative theories, or manner and means, of committing same offense); *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (jury need not reach unanimous agreement on preliminary factual

8

issues that underlie verdict, such as manner and means by which one offense was committed); *see also Richardson v. United States*, 526 U.S. 813, 817, 119 S. Ct. 1707, 1710 (1999) (noting by example that disagreement about means of offense of robbery "would not matter so long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force").

## C.     Analysis

The challenged instruction specifically directed the jury to answer "no" if it could not find unanimously that M.I.S. used or exhibited a deadly weapon during the aggravated robbery. We agree with M.I.S. that the trial court erred in directing a verdict based upon a non-unanimous answer.

M.I.S. contends that the error was harmful because he would have been entitled to a mistrial. But this contention assumes that Question 2 affected the jury's adjudication of delinquency for having committed the offense of aggravated robbery. On this record, it did not.

First, M.I.S. concedes that he could be adjudicated delinquent for the crime of aggravated robbery based on an affirmative response to Question 1, standing alone. A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property being stolen, such person (1) intentionally, knowingly, or recklessly causes bodily injury to another; or

9

(2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. TEX. PENAL CODE ANN. § 29.02 (West 2011). That person commits aggravated robbery if he or she "uses or exhibits a deadly weapon" during the robbery. *Id.* § 29.03(a)(2). "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a). "A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). "Each party to an offense may be charged with commission of the offense." *Id.* § 7.01(b). Question 1 contains all of the elements necessary to support a finding that M.I.S. committed aggravated robbery.

Second, M.I.S. has not shown that the supplemental instruction, which focused solely on Question 2, had any harmful influence on the jury's answer to Question 1, the guilt-innocence question. The jury was polled after the verdict; each juror individually confirmed that the jury's verdict to Question 1 was unanimous. M.I.S. contends that the jury's answers are in conflict because the overwhelming evidence at trial was that M.I.S. used or exhibited the shotgun; the jury's negation of that in answer to Question 2, he contends, calls into question the jury's answer to Question 1. But the jury could answer Question 1 affirmatively

10

for M.I.S. either as the primary actor or as a party. Although most of the evidence at trial supported a finding that M.I.S. used the shotgun during the commission of the robbery, Gasper recanted his statement implicating M.I.S. and testified that he held the shotgun during the robbery. Because the court charged the jury on the law of parties, a juror could find that M.I.S. committed aggravated robbery either as the person who used or exhibited the firearm or as an accomplice. The jury need not have been unanimous as to the manner in which he committed the offense, that is, whether he was a primary actor or a party to the offense. *See Leza,* 351 S.W.3d at 357.

Finally, although the record does not elucidate Question 2's intended purpose, it does show that the jury's answer to Question 2 did not affect the disposition or punishment based on the finding of delinquency. Because M.I.S. did not elect for the jury to determine punishment, the jury's answer to Question 2 did not affect any punishment determination. *See* TEX. FAM. CODE ANN. § 54.04(a) (West Supp. 2015) (requiring disposition hearing to "be separate, distinct, and subsequent to" adjudication hearing). The record also shows that the trial court did not consider a deadly weapon finding in connection with the punishment actually assessed. In its order of commitment to the Texas Juvenile Justice Department, the trial court left blank the box provided for a deadly weapon finding and the space for the type of weapon used. Accordingly, we hold that the trial court's error in

providing supplemental instruction to the jury does not require reversal. TEX. R. APP. P. 44.2; *see L.D.C.*, 400 S.W.3d at 575–56 (applying both criminal and civil standards to conclude that error did not warrant reversal).

## II. Denial of Motion to Suppress

### A. Standard of review

M.I.S. next contends that the trial court erred in denying his motion to suppress an impermissibly suggestive photographic array. We use the same standard to review a court's ruling on a motion to suppress in a juvenile case that we use in an adult criminal proceeding. *In re D.J.C.*, 312 S.W.3d 704, 711 (Tex. App.—Houston [1st Dist.] 2009, no pet.). Under that bifurcated standard, we defer to a trial court's express and implied findings of fact, as the trial court is the exclusive trier of fact and judge of the credibility of the witnesses, as well as the weight to be given their testimony. *Baird v. State*, 398 S.W.3d 220, 226 (Tex. Crim. App. 2013); *Smith v. State*, 236 S.W.3d 282, 289 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). We review de novo the legal significance of those facts. *See Baird*, 398 S.W.3d at 711. We sustain the trial court's ruling if it is reasonably supported by the record and correct on any theory of law applicable to the case. *See Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).

**B.      Substantive law**

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that the use of that identification at trial would deny the accused due process. *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995). A pretrial identification procedure may be suggestive by the manner in which it is conducted, such as if a police officer points out the suspect or suggests that the suspect is included in the photo array. *Barley*, 906 S.W.2d at 33. Suggestiveness may also arise if the suspect is the only individual closely resembling the pre-procedure description. *Id.* However, a failure to comply with a model policy or other policy adopted by law enforcement for administering a photograph lineup identification procedure, standing alone, does not require exclusion of the identification. *See* TEX. CODE CRIM. PROC. ANN. ART. 38.20, § 5(b) (West 2011).

We use a two-step analysis to determine the admissibility of the proffered identification, inquiring (1) whether the pretrial procedure was impermissibly suggestive, and if so, (2) whether the suggestive pretrial procedure gave rise to a very substantial likelihood of irreparable misidentification at trial. *Barley*, 906 S.W.2d at 33 (citing *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968)). The analysis requires an examination of the totality of the circumstances surrounding the particular case and a determination of the reliability

13

of the identification. *Id.*; *Barley*, 906 S.W.2d at 33. The defendant bears the burden to show by clear and convincing evidence that the in-court identification is unreliable. *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993); *Mims v. State*, 434 S.W.3d 265, 272 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

The United States Supreme Court has identified a number of nonexclusive factors to use in determining whether a pretrial photographic identification procedure has created a very substantial likelihood for irreparable misidentification. *See Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 382 (1972). These include:

- the witness's opportunity to view the criminal when the crime occurred;
- the witness's degree of attention;
- the accuracy of the witness's prior description of the criminal;
- the witness's level of certainty demonstrated at the confrontation; and
- the length of time between the crime and the confrontation.

*Id.*; *see Barley*, 906 SW.2d at 35 n.8. We weigh these nonexclusive factors "against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances." *Loserth v. State*, 963 S.W.2d 770, 772 (Tex. Crim. App. 1998) (citing *Biggers*, 409 U.S. at 199, 93 S. Ct. at 382–83).

## C.     Analysis

During the hearing on the motion to suppress, Sergeant Ashmore explained that, in a blind photo array procedure, one officer prepares the photo array and another officer—one who does not know the suspect's identity—shows the photo array to the witness.  This procedure avoids the possibility that an officer might give subtle visual cues to the witness examining the photo array.  Here, however, Sergeant Ashmore knew the suspect, prepared the photo array, and administered the photo array procedure to Caval.

M.I.S. contends that five flaws with the identification procedure rendered Caval's identification of M.I.S. inadmissible, specifically, that

- Sergeant Ashmore failed to use a "double-blind" procedure;

- Sergeant Ashmore was seated so that he could view Caval and the photo array while Caval examined it;

- after Caval selected M.I.S.'s photo, Sergeant Ashmore told him M.I.S.'s name and possibly confirmed that Caval had picked the right person;

- M.I.S. was the only person in the photo array who wore a striped shirt, while the rest of the images showed solid-color shirts; and

- Sergeant Ashmore did not know whether one person's photo appeared twice in the array.

We first consider M.I.S.'s contentions relating to the content of the array, specifically, his complaint that his striped shirt set him apart from the other images

15

and that the array had two images of the same person. A photo array may be impermissibly suggestive if, for example, other participants are greatly dissimilar in appearance from the suspect. *Withers v. State*, 902 S.W.2d 122, 125 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (citing *United States v. Wade*, 388 U.S. 218, 232–33, 87 S. Ct. 1926, 1935 (1967)). Minor discrepancies among lineup participants, however, will not render a lineup impermissibly suggestive: "neither due process nor common sense requires" that the other pictures used in a photographic array exactly match the defendant's characteristics. *Turner v. State*, 600 S.W.2d 927, 933 (Tex. Crim. App. 1980). Rather, the array must show individuals who fit a rough description of the suspect. *Wilson v. State*, 15 S.W.3d 544, 553 (Tex. App.—Dallas 1999, pet. ref'd).

A difference in the shirt colors or patterns does not, by itself, render a photographic lineup impermissibly suggestive. *See Cienfuegos v. State*, 113 S.W.3d 481, 492 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) ("The mere fact that appellant wore a red shirt did not render the lineup impermissibly suggestive."); *Epps v. State*, 811 S.W.2d 237, 244 (Tex. App.—Dallas 1991, no pet.) (holding photographic lineup not suggestive where defendant was only subject wearing jacket or jacket and red shirt), *cited in Cienfuegos*, 113 S.W.3d at 492; *Rodriguez v. State*, Nos. 07-11-00270-CR, 07-11-00271-CR, 2013 WL 3355724, at *4 (Tex. App.—Amarillo June 26, 2013, no pet.) (mem. op., not

designated for publication) (rejecting assertion that photo array was impermissibly suggestive where defendant was only subject in array wearing dark shirt and seemed closer to camera).

M.I.S. also points to two images of the same or very similar-looking person, who appear in the array wearing different clothes and hair styles at possibly different juvenile ages. Assuming that these photos were of the same person at different times, the array nonetheless contains a total of five different, but similar looking teens.

M.I.S.'s complaints concerning Sergeant Ashmore's administration of the identification procedure are likewise unavailing. First, the failure to use the "double-blind" procedure recommended in United States Department of Justice Guidelines does not render the array impermissibly suggestive. *See* TEX. CODE CRIM. PROC. ANN. art. 38.20, § 5(b); *see also Kelly v. State*, No. 14-13-00087-CR, 2014 WL 2446616, at *4 (Tex. App.—Houston [14th Dist.] May 29, 2014, no pet.) (mem. op., not designated for publication). Second, the record contains disputed evidence concerning Sergeant Ashmore's position during the procedure. At the suppression hearing, Caval testified that Sergeant Ashmore sat across a desk from him, in view of the photospread. Sergeant Ashmore, however, testified that he was behind Caval and specifically denied having been positioned where he could have seen the photo spread. With respect to the third complaint—Sergeant Ashmore's

17

confirmation that Caval had identified the right person—M.I.S. cites to the observation in *Ibarra v. State* that suggestiveness "may be created . . . by police pointing out the suspect or suggesting that a suspect is included in the line-up or photo array . . . ." 11 S.W.3d 189, 196 (Tex. Crim. App. 1999). Unlike the circumstances in *Ibarra*, though, Sergeant Ashmore's confirmation did not occur until after Caval had selected M.I.S. from the array.

The *Biggers* factors weigh against a finding that any suggestibility in the procedure affected Caval's identification of M.I.S. Caval had parked in a lighted area of the lot and had the opportunity to observe M.I.S.'s facial features clearly and in close range when M.I.S. twice approached the car window. Caval made a prompt and confident identification of M.I.S. within a day of the incident based on a detailed recollection of M.I.S.'s facial features. As a result, it is unlikely that the content of the array led Caval to misidentify M.I.S. as a participant in the robbery. *See Loserth*, 963 S.W.2d at 772 (adopting *Biggers* factors).

Accordingly, we hold that M.I.S. did not meet his burden of showing, by clear and convincing evidence, that Caval's positive identification of M.I.S. from the photo array gave rise to a very substantial likelihood of irreparable misidentification at trial. We therefore affirm the trial court's denial of the motion to suppress.

## III. Admissibility of In-Court Identification

M.I.S. also challenges the trial court's admission of Caval's in-court identification of M.I.S. An in-court identification is inadmissible if it is tainted by an impermissibly suggestive pretrial photographic identification. *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008); *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999). M.I.S.'s contention that the in-court identification was unreliable stands on the same claimed errors that, according to M.I.S., tainted Caval's pretrial identification. M.I.S.'s failure to demonstrate a substantial likelihood of irreparable misidentification with respect to Caval's pretrial identification of M.I.S. means that his argument concerning the reliability of Caval's in-court identification also fails. We therefore hold that the trial court did not err in admitting the in-court identification of M.I.S.

## IV. Denial of Motion for Continuance

Finally, M.I.S. contends that the trial court erred in denying his motion for continuance based on a missing witness. We review a trial court's ruling denying a motion for continuance for an abuse of discretion. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002). In determining whether there has been an abuse of discretion, we view the evidence in the light most favorable to the trial court and indulge every presumption in favor of the judgment. *Hatteberg v. Hatteberg*, 933 S.W.2d 522, 526 (Tex. App.—Houston [1st Dist.] 1994, no writ).

19

The State contends that M.I.S. waived any error in the ruling on his motion for continuance because he failed to include an affidavit or verify any facts relied on in support of the motion. Both the civil and criminal rules of procedure require sworn facts to support a motion for continuance. *See* TEX. R. CIV. P. 251 (requiring affidavit in absence of consent or operation of law); TEX. CODE CRIM. PROC. ANN. art 29.08 (West 2006) (requiring motion for continuance be sworn to by person having personal knowledge of facts relied on in motion). During the trial court's hearing on the motion, both sides related the circumstances giving rise to the motion and argued its merits. We therefore review the ruling out of an abundance of caution.

The State initially subpoenaed the prospective witness to testify about alleged criminal activity involving an unidentified person with Flores and Gasper that occurred approximately two-and-a-half hours after the carjacking, but later cancelled the subpoena. M.I.S. claimed that the witness's testimony would tend to cast doubt on whether M.I.S. was the third person involved in the carjacking by showing that M.I.S. was not with Flores and Gasper the entire day before the three were arrested at a vacant house. The record does not make clear whether the witness would be able to exclude the possibility that M.I.S. was the third person or otherwise provide in detail how her testimony would be material. Further, the State had identified the prospective witness sufficiently in advance of trial to allow

20

defense counsel to contact her. We hold that the trial court did not abuse its discretion in denying the motion for continuance.

## CONCLUSION

We affirm the judgment of the trial court.


Jane Bland
Justice

Panel consists of Justices Jennings, Keyes, and Bland.