**Opinion issued April 28, 2026**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-24-00301-CR**

————————————

**CAMERON DAVIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1740809**

---

# O P I N I O N

A jury found Cameron Davis guilty of murdering his girlfriend, and the trial court sentenced him to life in prison. Davis seeks reversal. In doing so, Davis makes the following three arguments:

1)     the evidence is legally insufficient to prove beyond a reasonable doubt that he is the person who murdered his girlfriend (in spite of eyewitness

testimony, including one eyewitness who said she saw him murder the victim);

2)   a pretrial photo array shown to one eyewitness was impermissibly suggestive, and this suggestiveness led to the misidentification of Davis as the murderer; and

3)   the trial court violated the requirement that the jury unanimously find him guilty because the court instructed the jury on two ways in which Davis could be guilty of murder, accompanied only by a general verdict form that did not distinguish between these two ways.

We hold that the evidence is legally sufficient to support the jury's finding of guilt. In addition, well-settled Texas law shows both that the photo array was not impermissibly suggestive and that the trial court's instructions did not violate the unanimity requirement. Accordingly, we affirm the trial court's judgment.

## BACKGROUND

A grand jury indicted Davis for murdering Ryniscia Sanford by shooting her with a firearm. The indictment alleged that he (1) intentionally or knowingly caused her death or (2) intended to cause her serious bodily injury and committed an act clearly dangerous to human life that caused her death. *See* TEX. PENAL CODE § 19.02(b)(1), (2).

Davis pled not guilty. The parties then tried guilt–innocence to a jury.

At trial, Margaret Washington (Sanford's friend) testified that she was talking with Sanford on the phone when she unwittingly provoked Davis's ire. Washington told Sanford she was going to set her up on a date. Unbeknownst to Washington, Sanford had the call on speakerphone, and Davis was with her.

2

At this point, Washington heard Sanford scream. The call abruptly ended, and Washington tried to call Sanford. Eventually, Davis answered the phone.

Washington knew Davis by Sanford's nickname for him: "King." Sanford and Davis were dating one another, and apparently had been off and on for years. Washington said she recognized Davis's voice from prior interactions with him.

Davis was angry, and he told Washington to come pick up Sanford. Washington could hear Sanford screaming in the background during the call.

Washington did not pick up Sanford, and at some point, the call ended.

When this unfolded, Sanford and Davis had been in her car in the parking lot of an apartment complex. The complex has surveillance cameras.

Surveillance footage showed Sanford getting out of the car and fleeing from a male passenger. Detective E. Wyatt, the lead homicide detective assigned to investigate the case, testified that this man looked like Davis, apart from having shorter hair than Davis did at trial. In Wyatt's opinion, the man in the footage was Davis.

At one point during her flight, Sanford sought refuge in an apartment that was open for carpet cleaning. One of the cleaners, Carlos Umana, testified at trial.

Umana said that Sanford ran into the apartment fast, as if she was in danger. Due to a language barrier, Umana was not able to talk with her much. But Sanford seemed upset or nervous, and Umana understood that she was asking for help.

3

Sanford hid behind the apartment door for a minute or less. Then a man with a handgun entered the apartment and took Sanford outside. On the stand, Umana described the man in question as having a dark complexion and "wavy" hair, testifying that the man's hair was braided.

Umana did not see the man or Sanford after they left the apartment. But Umana testified he heard gunshots a few minutes after the man took her away.

As part of their investigation, investigators showed Umana a photo array about six days afterward; the array was comprised of six men. Based on Umana's description, the men in the array, including Davis, were African-American and had braided hair. Umana identified Davis as the man who entered the apartment and took Sanford away.

Umana also identified Davis as the man in question in open court.

Samantha Wyble, who resided at the apartment complex, testified to witnessing the shooting. She was on her second-floor balcony drinking coffee and reading a book when she noticed a man arguing with Sanford in the courtyard below. They were about 30 to 35 feet away from where Wyble sat. According to Wyble, it was obvious that Sanford was scared of the man, who seemed to be trying to herd her in a particular direction, which she was resisting. Sanford kept saying, "Please just let me go." And the man replied, "I'm not going to do anything to you in front of the cameras."

4

Wyble began picking up her things to go inside and call the cops because the situation seemed serious. But before Wyble could do so, the shooting started.

According to Wyble, the man shot Sanford, who tried to flee. He followed her, continuing to shoot her as he went. Wyble said that the man shot Sanford multiple times. In the end, he stood over Sanford, who lay prone, shooting her at pointblank range.

Based on the description of the man that Wyble gave to investigators, they showed her a photo array of six men. She identified Davis as the shooter, qualifying her identification by indicating she was only 65 percent sure that it was him.

At trial, Wyble explained that she was only 65 percent certain when she reviewed the array because Davis's hair was longer in the photo than when she saw him shoot Sanford. She believed that Davis had shorter hair or a shaved head when he shot her.

Wyble also identified Davis as the shooter in open court. She said she was 100 percent sure that he was the shooter, even though he had braided hair at the time of the trial.

There were surveillance cameras in the area of the complex where the shooting occurred. As a result, the murder of Sanford was video-recorded.

The jury found Davis guilty as charged. The parties then tried punishment to the bench, and the trial court assessed Davis's punishment at life in prison.

**DISCUSSION**

**I.** **The evidence is legally sufficient to prove that Davis is the person who murdered Sanford.**

Davis argues that the evidence is legally insufficient to prove beyond a reasonable doubt that he is the person who murdered Sanford. We disagree.

**A.** **Legal sufficiency**

The test for legal sufficiency is whether a rational jury could find each essential element of the crime beyond a reasonable doubt. *Harrell v. State*, 620 S.W.3d 910, 913 (Tex. Crim. App. 2021). In conducting a legal-sufficiency review of the evidence, we consider all the admitted evidence, viewing it in the light most favorable to the verdict. *Id.* at 913–14. This standard recognizes it is the jury's role to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* at 914. So, we must defer to the jury's evaluation of the credibility of the witnesses and the weight to be given to various evidence. *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021).

**B.** **Analysis**

In every prosecution, the State must prove that the accused is the one who committed the crime charged. *Phillips v. State*, 534 S.W.3d 644, 651 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *see also Jones v. State*, 458 S.W.3d 625, 630 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (saying so in murder prosecution).

Here, to begin, the jury could have reasonably credited Washington's testimony. From it, the jury could have found that shortly before Sanford was murdered, she and Davis, who were in a dating relationship, became embroiled in an argument about the possibility that Sanford might see another man. This evidence placed Davis at the apartment complex where Sanford was murdered and in her company near the time of the murder; it showed that he had both a motive and the opportunity to murder her. *See Nisbett v. State*, 552 S.W.3d 244, 265 (Tex. Crim. App. 2018) (motive and opportunity are not sufficient, standing alone, to prove who killed the victim in a murder prosecution, but they are circumstances indicative of guilt); *see also Ingerson v. State*, 559 S.W.3d 501, 510 (Tex. Crim. App. 2018) (accused's anger at woman in whom he was romantically interested showed motive for her murder).

The defense put on a witness to dispute Washington's version of events. This witness, Laporchia Alexander, testified that Davis was known by the nickname "Pokey" and that no one called him "King," contrary to Washington's testimony. But this conflict in the evidence was for the jury to resolve, and the jury could have reasonably believed Washington, who said she recognized Davis's voice. *See Harrell*, 620 S.W.3d at 914 (jury resolves evidentiary conflicts).

Moreover, two eyewitnesses, Umana and Wyble, also placed Davis at the scene, quarreling with Sanford. Umana testified to seeing Davis with a handgun. Wyble testified to seeing Davis shoot Sanford.

The defense pointed out weaknesses in Umana's and Wyble's identification of Davis. The defense emphasized that Umana's description of Davis's hair as braided conflicted with other evidence, including surveillance footage, that seemed to show the perpetrator had short hair or a shaved head. The defense also pointed out that Wyble initially had only been 65 percent sure that Davis was the man that she saw shoot Sanford. But the jury heard both Umana and Wyble testify, and it was the jury's role to evaluate their credibility and decide what weight to give to their identifications. *See Martin*, 635 S.W.3d at 679 (appellate court defers to the jury's credibility determinations and to the weight a jury assigns to various evidence).

Here, the jury could have reasonably credited the witnesses' identifications of Davis in spite of their shortcomings. For example, Umana was not the only one who was apparently mistaken about the nature of the perpetrator's hair. M. McElvany, a crime scene investigator who viewed the surveillance footage afterward, testified that he found it difficult to say what hairstyle the perpetrator wore, and it appeared as though he had braided hair. In addition, Detective Wyatt testified that inconsistent witness statements are not unusual in traumatic situations, like this one. On this record, the jury could have reasonably found that Umana's identification of Davis

was accurate in general, even if Umana was mistaken in some particular detail. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (jury may accept or reject witness's testimony in whole or part); *Jeansonne v. State*, 624 S.W.3d 78, 92 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (citing *Sharp* for same proposition); *see also, e.g., Arrellano v. State*, 555 S.W.3d 647, 651 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (inconsistencies between accounts of eyewitnesses and inconsistencies between their pretrial statements and their testimony did not render evidence legally insufficient); *Davis v. State*, 177 S.W.3d 355, 358–59 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (eyewitness testimony was not legally insufficient merely because it was ostensibly inconsistent with physical evidence).

Similarly, any uncertainty in Wyble's pretrial identification, as compared to her in-court identification of Davis as Sanford's murderer, was for the jury to resolve. *See Martin*, 635 S.W.3d at 679 (appellate court defers to jury's credibility assessments); *Harrell*, 620 S.W.3d at 914 (jury resolves evidentiary conflicts); *Sharp*, 707 S.W.2d at 614 (jury was tasked with resolving inconsistencies in eyewitness's account, and even a total failure to identify the defendant on one occasion would go only to the weight of the witness's identification). In fact, if credited by the jury, as it reasonably could have been here, Wyble's testimony that she saw Davis shoot Sanford is on its own legally sufficient to support the jury's finding of guilt. *See Shah v. State*, 414 S.W.3d 808, 812 (Tex. App.—Houston [1st

Dist.] 2013, pet. ref'd) ("It is well-established that the testimony of a sole witness to an offense may constitute legally sufficient evidence to support a conviction.").

We overrule Davis's issue concerning the legal sufficiency of the evidence.

## II. The trial court did not abuse its discretion in denying Davis's motion to suppress Umana's out-of-court pretrial identification of him; the array was not impermissibly suggestive.

Davis next argues that the trial court abused its discretion by denying his motion to suppress Umana's pretrial identification of him because the photo array was impermissibly suggestive, thereby violating his right to due process. We disagree that the array was impermissibly suggestive. The trial court did not err.

### A. Impermissible suggestiveness

Complaints about the suggestiveness of a photo array are subject to a two-step inquiry. The defendant must first show "by clear and convincing evidence that the pretrial procedure was impermissibly suggestive." *Balderas v. State*, 517 S.W.3d 756, 792 (Tex. Crim. App. 2016). If he does not do so, our inquiry ends, and his complaint fails. *See Ford v. State*, 919 S.W.2d 107, 117 (Tex. Crim. App. 1996). If the defendant shows the array was impermissibly suggestive, we proceed to the next step and "assess[] the reliability of the identification under the totality of the circumstances" to ascertain whether the procedure "gave rise to a very substantial likelihood of irreparable misidentification." *Balderas*, 517 S.W.3d at 792, 796.

A photo array may be impermissibly suggestive in the way in which it is presented to the witness or due to the content of the array itself. *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). As to content, an array "may be impermissibly suggestive if the suspect is the only individual in the array who closely resembles the pre-procedure description." *Balderas*, 517 S.W.3d at 794. But the people in the array "need not be identical" to one another. *Id.*; *see also Ragsdale v. State*, 713 S.W.3d 435, 458 (Tex. App.—Houston [1st Dist.] 2025, no pet.) (persons should be similar enough to reasonably test reliability of identification).

When a defendant argues the content of the array itself was impermissibly suggestive on its face and his challenge does not turn on witness credibility, we review the issue of suggestiveness de novo. *Colgin v. State*, 132 S.W.3d 526, 531–32 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd); *see also Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009) (reviewing de novo ruling on how suggestiveness of photo array may have influenced in-court identification). But we defer to the trial court's determination of historical facts supported by the record when its fact findings turn on the credibility and demeanor of the witnesses. *Colgin*, 132 S.W.3d at 531.

**B.    Analysis**

The photo array is in the record. It features headshots (photographs from the shoulders up) of six African-American men in two rows of three. The photos are of

11

the same size and shape. They were taken from approximately the same perspective and are of the same general quality. The men in the array appear to be in the same general age range. Each of the men has a braided hairstyle with the same color of hair (black). The six men have similar complexions. To the extent their clothing is visible, all are dressed in casual civilian clothes. The backgrounds of the photos are plain. From the photos, it is not possible to discern the heights or weights of the men. Davis is not the "only individual in the array who closely resembles the pre-procedure description." *Balderas*, 517 S.W.3d at 794. Davis does not stand out from the others in a way that emphasizes his presence in the array or that tends to draw the viewer's eye to him in particular.

Our Court has held that photo arrays comparable to this one were not impermissibly suggestive. *See, e.g.*, *Colgin*, 132 S.W.3d at 532 (photos of six white men dressed in civilian clothes with similar facial features and receding hairlines were roughly similar; array was not impermissibly suggestive); *Page v. State*, 125 S.W.3d 640, 647 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (array of six African-American men dressed in civilian clothes with short black hair who appeared to be of similar age was not an impermissibly suggestive despite slight differences); *Goldberg v. State*, 95 S.W.3d 345, 356–57, 378 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (array of six photos of equal quality, size, and shape, taken from same general perspective, showing young white men with light blond to

12

dark brown hair, and in which appellant was not distinctive, was not impermissibly suggestive).

At trial, Davis argued that the array at issue was impermissibly suggestive because he is the only person in it wearing a red shirt. But he did not explain why this makes the array suggestive. The color of the shirts worn by the six men varies. Two wore a white shirt, one wore a blue shirt, one wore a black shirt, one wore a dark-colored shirt that may have been black, and Davis wore a red shirt.

Under settled law, the fact that Davis was the lone person in the array who wore a red shirt does not make the array impermissibly suggestive. *See, e.g., Cienfuegos v. State*, 113 S.W.3d 481, 492 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (rejecting claim that array was impermissibly suggestive because appellant was only one wearing red shirt); *see also In re M.I.S.*, 498 S.W.3d 123, 132 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (difference in shirt colors or patterns did not make array impermissibly suggestive).

Notably, Umana testified that he could not recall what color shirt the armed man who came into the apartment searching for Sanford was wearing at the time. And Wyble, the other eyewitness, testified that the man who shot Sanford was dressed in a white shirt. So Davis cannot even contend the red shirt was intended to suggest or did suggest his identity by corresponding to the clothing he was said to have worn when he allegedly committed the murder. *Cf. Fisher v. State*, 525 S.W.3d

13

759, 763 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (rejecting claim that array showing appellant in red-hooded sweatshirt was impermissibly suggestive given that this matched the description of the perpetrator's clothing provided by witness).

Davis also argued at trial that the array was impermissibly suggestive because he says that he is the only person in the array who does not have a beard. But on its face, the array does not support his position:



To begin, shadows in the photos make it somewhat unclear how many do and how many do not have beards. At least two men plainly have short beards. But the extent to which the other men do is difficult to discern due to shadows. Before the trial court denied Davis's motion to suppress, Detective A. Vera, the homicide investigator who prepared the array, testified about the uncertainty created by these shadows. Later, during trial, Sergeant A. Hinojosa, who was a homicide investigator at the time of the investigation and presented the array to Umana, testified similarly regarding the shadows. On this record, the trial court could have reasonably rejected Davis's premise that he alone among the six men in the array was beardless.

Our Court and others have routinely held that variations in facial hair of the sort that appear in this array do not make the array impermissibly suggestive. *See, e.g.*, *Ragsdale*, 713 S.W.3d at 458 (photo array was not impermissibly suggestive when four of six African-American men in it had light facial hair); *Escovedo v. State*, 902 S.W.2d 109, 116–17 & n.4 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (photo array of six Hispanic men with similar characteristics but variations in facial hair—four had beards and mustaches and only one was similar to appellant's—was not impermissibly suggestive); *see also Turner v. State*, 600 S.W.2d 927, 932–33 (Tex. Crim. App. [Panel Op.] 1980) (rejecting argument that five-person line-up was impermissibly suggestive because only appellant and two others had beards and these two other men were unlike appellant in size or hair color); *Wilson v. State*, 15

15

S.W.3d 544, 552–53 (Tex. App.—Dallas 1999, pet. ref'd) (rejecting argument that array was impermissibly suggestive when defendant argued (among other things) that he was "the only person in the photographic spread without facial hair"; all of the men in the array were African-American, bald, and appeared to be approximately the same age); *Mallard v. State*, 661 S.W.2d 268, 276–77 (Tex. App.—Fort Worth 1983, no pet.) (line-up of five men was not impermissibly suggestive even though defendant was "the only one with no obvious facial hair"; all five in line-up were African-American men of the same general height and weight and they were all dressed in substantially the same manner).[1]

---

[1] On appeal, Davis primarily focuses on the second step of the inquiry—whether the photo array gave rise to a very substantial likelihood of irreparable misidentification. For example, he emphasizes that Umana's pre-procedure description of the suspect as having braided hair is inconsistent with the video surveillance footage showing that the suspect had closely cropped hair instead.

But the second step of the inquiry is immaterial absent a showing of impermissible suggestiveness. *Ford*, 919 S.W.2d at 117; *see also Haq v. State*, 445 S.W.3d 330, 337 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (second step of inquiry concerning reliability of identification "need only be considered once a determination has been made that the relevant out-of-court identification procedure was impermissibly suggestive"); *Anderson v. State*, 414 S.W.3d 251, 258–59 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (second step inquiring into reliability of identification is not relevant to first step as to impermissible suggestiveness). And whether Umana may have been mistaken in his belief about the length or style of the suspect's hair has no bearing on whether the array created based on that description was impermissibly suggestive. *See, e.g., Barley*, 906 S.W.2d at 33 (inquiry as to whether content of array itself is impermissibly suggestive concerns whether "suspect is the only individual closely resembling the pre-procedure description" of the suspect).

In sum, while the six persons in the photo array are not identical, identicalness is not required. *Balderas*, 517 S.W.3d at 794. The array features men who correspond to a rough description of the suspect provided by Umana, and the array was not impermissibly suggestive. *See, e.g.*, *Anderson v. State*, 414 S.W.3d 251, 254, 258–59 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (photo array of six bald, tattooed white men of the same general age was not impermissibly misleading even though only three, including appellant, had facial hair; the court rejected the complaint that distinguishing characteristics of the other five made the array too suggestive, explaining that "a photo array must contain individuals who fit a rough description of the suspect" (citation modified)). And having held that the array was not impermissibly suggestive, we conclude that Davis's complaints about the array fail. *See Ragsdale*, 713 S.W.3d at 458 (court of appeals did not need to address second step as to whether photo array created substantial likelihood of misidentification, given its holding that the array was not impermissibly suggestive).

We overrule Davis's issue concerning the photo array.

## III. The trial court did not violate the jury unanimity requirement by instructing the jury on two alternate ways of committing murder under sections 19.02(b)(1) and 19.02(b)(2).

A guilty verdict in a felony criminal prosecution must be unanimous. *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005). Davis argues that the trial court's jury charge erroneously allowed the jury to find him guilty without unanimity

because the court disjunctively instructed the jury on two ways in which he may have committed murder—by intentionally or knowingly causing Sanford's death or by intending to cause serious bodily injury and committing an act clearly dangerous to human life that caused Sanford's death—accompanied by a general verdict form that did not require the jury to specify which of these two ways the jury found was proven. *See* TEX. PENAL CODE § 19.02(b)(1), (2) (criminalizing both of these acts as murder).

As Davis acknowledges, binding Texas precedent has already rejected this argument. *See Saenz v. State*, 451 S.W.3d 388, 390 (Tex. Crim. App. 2014). As the Court of Criminal Appeals has held, a trial court does not violate the unanimity requirement by disjunctively instructing the jury on alternate ways of committing the same crime. *Id.*

With respect to murder, the Court of Criminal Appeals has held that different legal theories about the same victim's death are alternate ways of committing the same crime. *Davis v. State*, 313 S.W.3d 317, 342 (Tex. Crim. App. 2010). In other words, intentionally or knowingly causing death and intending to cause serious bodily injury and committing an act clearly dangerous to human life that causes death are merely two ways of committing the same crime—murder. Thus, their disjunctive submission in the charge does not violate the unanimity requirement.

Courts across Texas have repeatedly reached this conclusion. *See, e.g.*, *Yost v. State*, 222 S.W.3d 865, 877–78 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (unanimity requirement not violated by disjunctively instructing jury on murder under sections 19.02(b)(1) and (b)(2) of the Texas Penal Code); *see also Aguirre v. State*, 732 S.W.2d 320, 324–26 (Tex. Crim. App. 1982) (op. on reh'g) (no error in disjunctively instructing jury on two alternate ways of committing murder: intentionally or knowingly causing death and so-called felony murder, which are now codified in sections 19.02(b)(1) and 19.02(b)(3) of the Texas Penal Code); *Braughton v. State*, 522 S.W.3d 714, 727–28 (Tex. App.—Houston [1st Dist.] 2017) (citing *Aguirre* for proposition that sections 19.02(b)(1) and 19.02(b)(2) are alternate ways of committing murder), *aff'd*, 569 S.W.3d 592 (Tex. Crim. App. 2018).

Our own Court has repeatedly held that the disjunctive submission of murder under sections 19.02(b)(1) and 19.02(b)(2) accompanied by a general verdict form does not violate the unanimity requirement. *See, e.g.*, *Harris v. State*, No. 01-23-00549-CR, 2025 WL 994036, at *6–8 (Tex. App.—Houston [1st Dist.] Apr. 3, 2025, pet. ref'd) (mem. op., not designated for publication); *Lazarine v. State*, No. 01-19-00982-CR, 2021 WL 5702182, at *4–9 (Tex. App.—Houston [1st Dist.] Dec. 2, 2021, pet. ref'd) (mem. op., not designated for publication); *Pierre v. State*, No. 01-11-00681-CR, 2012 WL 6644780, at *1–2 (Tex. App.—Houston [1st Dist.] Dec. 20, 2012, pet. struck) (mem. op., not designated for publication).

We overrule Davis's issue concerning jury unanimity.

## CONCLUSION

We affirm the trial court's judgment.

Jennifer Caughey
Justice

Panel consists of Justices Guerra, Caughey, and Dokupil.

Publish. TEX. R. APP. P. 47.2(b).