Opinion issued February 10, 2022



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-19-00712-CV

—————————————

## IN THE MATTER OF J.J.

On Appeal from the 315th District Court
Harris County, Texas
Trial Court Case No. 2018-03598J

## EN BANC OPINION ON RECONSIDERATION

Appellant J.J. has filed a motion for en banc reconsideration of our June 27, 2021, opinion and judgment. We grant the motion for rehearing, withdraw our prior opinion and judgment, and issue this opinion and judgment in their stead.

The State of Texas filed a petition in juvenile court alleging that 14-year-old J.J. ("Joshua Jordan")[1] had engaged in the delinquent conduct of capital murder. After the court denied Joshua's motion to suppress his statements to police, Joshua waived his right to a jury trial and stipulated to the evidence against him, subject to the motion to suppress. The trial court then assessed a 20-year determinate sentence and remanded Joshua to the custody of the Texas Juvenile Justice Department. Joshua contends on appeal that the trial court erred in denying his motion to suppress because his confession resulted from custodial interrogation without the statutory warnings required by the Texas Family Code. We reverse.

## Background

In 2018, a 14-year-old informed Houston Police Department Detective J. Roscoe that he had been in a car with Joshua and a 16-year-old driver and witnessed Joshua kill someone. Joshua told the driver to stop the car, attempted to rob a woman, and then shot the woman in the back of the head after she tried to pepper spray him. Officer Roscoe also received a call from Officer Hastings with Houston Independent School District who informed him that a student reported that he was shown a cell phone video of a murder by someone who was later identified as Joshua.

Joshua was in the seventh grade at a Disciplinary Alternative Education Program school. *See* TEX. EDUC. CODE § 37.008(a). Armed with the information

---

[1] To protect J.J.'s privacy, we refer to him by a pseudonym. *See* TEX. R. APP. P. 9.8(c).

from the two witnesses, Detective Roscoe and his partner, Sergeant Holbrook, went to Joshua's school to interview him. As Detective Roscoe acknowledged, had HPD formally taken Joshua into custody, they would have had to bring him before a magistrate to give him statutory warnings of his rights. *See* TEX. FAM. CODE § 51.095. Joshua was HPD's primary suspect.

HISD Officer Lofton retrieved Joshua from his classroom and escorted him to meet with the HPD officers next to the school's on-site police office. Detective Roscoe and Sergeant Holbrook met Officer Lofton and Joshua near the school police office, and Lofton escorted them to a room for the interview. Detective Roscoe did not know if Joshua knew whether he had to stay or could leave.

Detective Roscoe described the interview room as a rectangular office with a desk and table. Joshua sat in a chair two to three feet from the entrance; the door was closed. He was not handcuffed. The officers offered Joshua a snack or something to drink, but he declined. After some small talk about the Houston Rockets game the night before, Sergeant Holbrook turned to the reason police brought Joshua there:

> Alright well we wanted to sit here and talk to you. Now at the end of this interview, whatever—we wanted to sit here and talk to you and if you want to sit and talk to us that would be great. At the end of the interview you're going back to class. Okay? There's no warrant for your arrest, okay? You're not going to jail.

Joshua responded, "Yes, sir." Neither officer confirmed which of the four statements Joshua was agreeing with. At no time did the officers read Joshua his

3

rights. Neither officer confirmed with Joshua that he understood what they had said to him. Neither officer told Joshua he did not have to answer the officers' questions or that he was free to return to class without participating in the interview. At no time did either officer warn Joshua that if he made statements, they could be used against him. At no time did either officer offer to call Joshua's mother or ask him if he wanted a lawyer. No school official or other trusted adult was in the room. Joshua was alone with two HPD officers behind a closed door near the school police office with a third officer not far away.

Joshua appeared calm during the interview, which the officers audio recorded. The officers explained that they wanted to talk with Joshua and get his side of the story because other witnesses they had interviewed were "putting [Joshua] in something" and that they did not want to take these witnesses' word and "just do something that's going to change [his] life." Joshua asked what the officer meant by "putting [him] in stuff," and Sergeant Holbrook confronted Joshua with evidence that he shot a woman during a robbery.

Joshua then admitted that he intended to rob the woman, but claimed he did not intend to shoot her:

> We were riding around that night. Shooting. It was an accident. Like the gun went off. Like the trigger wasn't even pulled. Like it was a faulty gun or something. The trigger wasn't even pulled. I didn't even know the gun was loaded.

4

At the end of the interview, which lasted about 18 minutes, the officers directed Joshua to check in with Officer Lofton before returning to class so that he would not get in trouble for wandering in the halls. Joshua was arrested five days after police questioned him.

Joshua's recollection of the interview differed from Detective Roscoe's.[2] Joshua testified that HISD Officer Lofton came to get him from class, and that twice he asked Officer Lofton if he could call his mother, but he was not allowed to do so. Contrary to Detective Roscoe's testimony, Joshua testified that Detective Roscoe was already in the interview room and that only Sergeant Holbrook came into the hall to meet him and Officer Lofton. Joshua claimed that, before the recording, he asked Sergeant Holbrook again if he could call his mother and was not allowed to do so. Joshua testified that he took the chair nearest the door, but that Roscoe's seat was blocking the door and he could not leave. Joshua testified that he did not understand that he was free to leave, or he would have asked to leave. Joshua testified that when the officers said that if he wanted to talk to them that would be great, he responded "yes" because he understood that he was not going to jail, but he did not understand that he did not have to talk to them. Joshua also stated that he did not

---

[2] Because the trial court did not make findings of fact, we view the evidence in the light most favorable to the decision to deny the motion to suppress. *In re R.J.H.*, 79 S.W.3d 1, 7 (Tex. 2002). To the extent that the two accounts diverge, we credit Detective Roscoe's testimony, as the trial court implicitly did.

answer all the officers' questions, and when asked if "[he] felt like [he] could have not answered the questions," he responded, "Yes, ma'am," but also stated that he "still felt uncomfortable there[.]" Joshua agreed that, once he entered the interview room and the officers began recording, he never asked to leave or to call his mother.

Joshua testified that Detective Roscoe was lying when he said that no one was blocking the door, when he claimed that the two officers never separated, and when he said that Sergeant Holbrook never met with Joshua alone in the hallway. Joshua also testified that, while Sergeant Holbrook was alone with Joshua, he told Joshua that "if I didn't [talk to them] I would be going to jail[.]"

As part of the suppression hearing, Joshua and the State executed a stipulation of dispositive motion to suppress. If the juvenile court found Joshua's statement admissible, Joshua agreed to stipulate true to the capital murder allegation. Alternatively, if the juvenile court found the statement inadmissible, the State agreed to dismiss the petition against Joshua. Given this agreement, our review is outcome determinative.

## MOTION TO SUPPRESS

### A. Standard of Review

We review a trial court's denial of a motion to suppress statements under a bifurcated standard. *See Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013); *see also In re R.J.H.*, 79 S.W.3d 1, 6 (Tex. 2002) (standard of review for

6

rulings on motion to suppress is the same in juvenile cases as in adult criminal proceedings). When the police obtain a confession from a juvenile without first bringing him before a magistrate to read him his rights, an appellate court evaluates whether the juvenile was in custody by (1) conducting a factual review by examining the circumstances surrounding the interrogation, and (2) making an ultimate legal determination about whether a reasonable person would have felt at liberty to terminate the encounter and leave. *See State v. Saenz*, 411 S.W.3d 488, 493 (Tex. Crim. App. 2013). Although we give almost total deference to the trial court's assessments of historical fact and conclusions that turn on credibility, we review de novo mixed questions of law and fact that do not turn on credibility, such as the ultimate legal determination of whether the juvenile was in custody when he confessed. *Id*. at 494.

Because the trial court did not enter findings of fact, we view the evidence in the light most favorable to the trial court's ruling and assume the trial court made implicit findings of fact supported by the record. *In re R.J.H.*, 79 S.W.3d at 7. We will sustain the trial court's ruling if it is reasonably supported by the record and correct on any theory of law applicable to the case. *In re M.I.S.*, 498 S.W.3d 123, 130 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

## B.    Applicable Law

The Fifth Amendment privilege attaches before the State files any formal accusation "and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). "[W]ithout proper safeguards[,] the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.*; *see In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring) ("Although there are no doubt costs to society (and possibly even to the youth himself) in letting a guilty youth go free," constitutional protections must be maintained to guard against a "far worse" result—"convict[ing] an innocent").

The Texas Family Code requires that if a child is "in a detention facility or other place of confinement" or "in the custody of an officer," the child be given warnings by a neutral magistrate (not an officer) before interrogation. *See* TEX. FAM. CODE § 51.095(d). These warnings mostly track *Miranda*[3] and include that the child:

> (1)  may remain silent, not make any statement at all and that any statement the child makes may be used in evidence against the child;

---

[3]    The warning that the juvenile may terminate the interview at any time, however, is not required by *Miranda* but is mirrored in the Texas Code of Criminal Procedure. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) (citing TEX. CODE CRIM. PROC. art. 38.22 § 3).

(2) has the right to have an attorney present to advise the child either prior to or during any questioning;

(3) has the right to have an attorney appointed to represent the child before or during any interviews with police or prosecutors; and

(4) may terminate the interview at any time.

*See* TEX. FAM. CODE § 51.095(a). The magistrate's warnings must be part of the recording of the child's statement, and the child must knowingly, intelligently, and voluntarily waive each right before giving the statement. *Id.* § 51.095(a)(5). The magistrate can direct the police to return the child and the recording to the magistrate after the interrogation to determine whether the statement was voluntary. *Id.* § 51.095(f).

A juvenile's statement procured by custodial interrogation without the benefit of a magistrate's warning is inadmissible at trial. *See id.* § 51.095(a)(5), (b)(1); *see also* TEX. CODE CRIM. PROC. art. 38.22 § 3. "[C]ustodial interrogation is questioning that is initiated by law enforcement after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Delacerda v. State*, 425 S.W.3d 367, 386 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The State does not contest that the police interrogated Joshua. Thus, the question is whether Joshua was "in custody" or "otherwise deprived of his freedom in any significant way" when he made his statements.

9

"A suspect is . . . 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc). To determine whether an individual is in custody, we focus on the objective circumstances of the questioning, not on the subjective views of either the interrogating officers or the child being questioned. *See Stansbury v. California*, 511 U.S. 318, 322 (1994); *In re D.J.C.*, 312 S.W.3d 704, 712 (Tex. App.—Houston [1st Dist.] 2009, no pet.). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011).

In the juvenile context, a "reasonable person," means a reasonable child, so long as the child's age was known to the officers. *See id.* at 270-277. As the Supreme Court has recognized, "children cannot be viewed simply as miniature adults." *Id.* at 274. Events that "would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." *Haley v. Ohio*, 332 U.S. 596, 599 (1948) (plurality opinion); *see Gallegos v. Colorado*, 370 U.S. 49, 54 (1962) ("[N]o matter how sophisticated" the child, police interrogation of a juvenile suspect "cannot be

10

compared" to an adult). Thus, we consider whether, based on the objective circumstances, a reasonable child of the same age would believe that his freedom of movement was significantly restricted. *Jeffley v. State*, 38 S.W.3d 847, 855 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd).

The Court of Criminal Appeals has established at least four general situations that may constitute custody: (1) if the suspect is physically deprived of his freedom in any significant way; (2) if a law-enforcement officer tells the suspect not to leave; (3) if a law-enforcement officer creates a situation that would lead a reasonable child to believe that his freedom of movement has been significantly restricted such that he was not free to terminate the interview and leave; and (4) there is probable cause to arrest the suspect and the law-enforcement officer did not tell the suspect he is free to leave. *See Gardner v. State*, 306 S.W.3d 274, 293–94 (Tex. Crim. App. 2009); *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996).

The first three situations require that the restriction on a suspect's freedom of movement must reach "the degree associated with an arrest" instead of an investigative detention. *Dowthitt*, 931 S.W.2d at 255. The fourth situation requires an officer's knowledge of probable cause to be manifested to the suspect. *Id.* Custody, however, is not established here unless the manifestation of probable cause, "combined with other circumstances" of the interview such as its duration or "the exercise of police control over [a suspect]," is significant enough to lead a reasonable

11

child to believe that he is under restraint to the degree associated with an arrest. *Id.* at 255–57. With these principles in mind, we turn to the interrogation here.

## C. Analysis

Joshua relies on the fourth *Dowthitt* situation, arguing that "Officers had probable cause to arrest [him] based upon the information they had received [from other witnesses] prior to the interview," and that Joshua "would have also become aware of the Officers['] probable cause to arrest him based upon the statements that the Officers made during the course of the interview, despite the Officers['] statements that [he] was not going to jail." The State contends that a "reasonable person would not have believed himself to be in custody when police spoke to him at school, and told him he would return to class, was not under arrest, and was not going to jail."

### 1. The officers had probable cause

Detective Roscoe testified that Joshua was the primary suspect in the April 2018 murder when he interviewed him. Joshua was the primary suspect based on (1) information from a child who said they had been in a car with Joshua and seen Joshua ask the driver to pull over, attempt to rob a woman, and then shoot her, and (2) information from another child who told an HISD officer that he had seen a cell phone video of someone who other witnesses had identified as Joshua shooting someone. Still, Detective Roscoe testified he did not have probable cause because

12

he had not talked to Joshua to get his side of the story. The State does not argue, and we have located no case requiring, that the officer get the suspect's side of the story to have probable cause to arrest.

Instead, probable cause exists when an officer has sufficient trustworthy information to warrant a person of reasonable caution in the belief that, more likely than not, a particular person has committed a crime. *Torres v. State*, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005). Here, police had substantial information implicating Joshua as the perpetrator of the offense. They had a body, a tip from an eyewitness who claimed to have seen Joshua commit murder and described what happened, and another witness who claimed to have seen a video of someone identified as Joshua shooting someone that was consistent with the tip from the eyewitness. *See Muniz v. State*, 851 S.W.2d 238, 251 (Tex. Crim. App. 1993) (police had probable cause to arrest in capital murder case because police had found the body, a witness had seen a person fitting the victim's description being followed by the defendant the day she disappeared, and police believed a struggle had ensued where her belongings were later recovered near some damaged hedges). The facts here contrast with *Ervin v. State*, 333 S.W.3d 187, 210 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd), where the officers lacked probable cause because the defendant gave an inculpatory statement while police considered her a witness to a capital murder but not a suspect. Here, Detective Roscoe had at least two potential

witnesses and reason to believe there was a video of Joshua committing capital murder. The officers had probable cause.

## 2. The officers manifested probable cause to Joshua

For the fourth *Dowthitt* circumstance to apply, Joshua must not only show that the officers had probable cause, but also that the officers manifested it to him during the interrogation. *Dowthitt*, 931 S.W.2d at 255–57; *see Bengivenga*, 845 F.2d at 597 n.16 ("The awareness of the person being questioned by an officer that he has become the 'focal point' of the investigation, or that the police have ample cause to arrest him, may well lead him to conclude, as a reasonable person, that he is not free to leave, and that he has been significantly deprived of his freedom" (emphasis in original) (citation omitted)); *Meek v. State*, 790 S.W.2d 618, 621 (Tex. Crim. App. 1990).

Had the officers not told Joshua that "people were putting him in something," their suspicion would have remained a subjective feature of their investigation not relevant to the analysis of custody. Instead, Sergeant Holbrook told Joshua "enough people are putting you in this to an extent that I don't think the answer can be like 'I don't know nothing about it.'" In other words, Sergeant Holbrook told Joshua that others were implicating him, and that Sergeant Holbrook believed them, prompting Joshua to ask, nearly two minutes into the interrogation, what the officers were talking about.

14

The officers then showed Joshua pictures of the deceased woman. They asked him if he knew two other people. These were two of the other people Joshua later said were in the car the night of the murder.

After Joshua said that he knew those two kids, Sergeant Holbrook said that some of "Javier's people" said that Joshua and others were riding around "back in April" and came upon the woman in the photo and "somebody wound up shooting her." Sergeant Holbrook identified the source of his information and specifically said that somebody in Joshua's group shot the woman in the photo. This is where Sergeant Holbrook most clearly manifested probable cause to Joshua, who responded after a long pause by quietly saying the shooting was an accident, "like the trigger wasn't even pulled." Then Sergeant Holbrook told Joshua to tell him "how it all came down." Joshua complied. He said he asked the driver to stop the car so he could relieve himself, and that he and his mom "were struggling and had no food" and he was "trying to rob the lady."

Sergeant Holbrook had Joshua mark on a piece of paper where he was standing and where the woman was standing. Shortly after completing the drawing with Joshua, Sergeant Holbrook concluded the interrogation and told Joshua to check in with the HISD officer to avoid "getting in trouble."

The manifestation of probable cause to Joshua combined with the police's failure to inform him that he had the right to leave, given the other circumstances of

15

the interrogation, satisfy the fourth *Dowthitt* situation. *Dowthitt*, 931 S.W.2d at 255; *see Bengivenga*, 845 F.2d at 597 n.16; *Meek*, 790 S.W.2d at 621.

Similar manifestations have been held to establish custody. *See In re D.A.R.*, 73 S.W.3d 505, 512 (Tex. App.—El Paso 2002, no pet.) (15-year-old was in custody when interviewed by just one police officer in a closed room at school who told the student it was "too much of a coincidence" that so many people told him the student had a gun); *Holguin v. Harrison*, 399 F. Supp. 2d 1052, 1058 (N.D. Cal. 2005) (a reasonable 17-year-old left alone in the principal's office with police "would not believe he could simply get up and walk away while being accused by three officers of having committed a murder.").

**3. The manifestation of probable cause, combined with other circumstances, would lead a reasonable child to believe he was not free to terminate the interview and leave**

Viewing the evidence in the light most favorable to the State, there were several features of the interrogation that, combined with the manifestation of probable cause to Joshua, would lead a reasonable 14-year-old child to believe he was not free to terminate the interrogation and leave.[4]

---

[4] The dissent suggests that the majority has placed too much emphasis on the fact that Joshua's interrogation took place at school rather than whether he was restrained. This was not just any school interrogation, but one of a seventh grader at a disciplinary school, in isolation, without parents, any trusted adult, or a school administrator, in a capital murder investigation where Joshua was the prime suspect. The context distinguishes this case from *Martinez v. State*, 131 S.W.3d 22 (Tex. App.—San Antonio 2003, no pet.) (parent agreed to 15-year-old son providing

First, the setting was not neutral. Joshua was not interrogated where he was found. The interrogation did not take place in Joshua's home, but in a school, where he had to be and had no control over the environment. *See Schall v. Martin*, 467 U.S. 253, 265 (1984) ("[J]uveniles, unlike adults, are always in some form of custody."). Police chose a location where Joshua could not voluntarily leave without consequences. *See* TEX. EDUC. CODE § 25.085–.087, .095.

What's more, this was not an average HISD school, but a Disciplinary Alternative Education Program school where Joshua had been recently sent after he was removed from his regular middle school. As the name suggests, DAEP school is a punitive measure short of expulsion required by the education code if the student violates certain aspects of the school's code of conduct. *See id.* § 37.006; *Stafford Mun. Sch. Dist. v. L.P.*, 64 S.W.3d 559, 563 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (DAEP school has "stricter discipline" than traditional school programs). The education code requires school districts to "provide a disciplinary alternative education program" outside the student's regular classroom, possibly off campus, separated from students who are not in the disciplinary program, with teachers

statement and accompanied him to police station but probable cause was not conveyed to juvenile); *In re J.W.*, 198 S.W.3d 327 (Tex. App.—Dallas 2006, no pet.) (officer asked 16-year-old after school hours at a stadium during a football game about a stolen camera in the presence of two school administrators but lacked probable cause). Neither case cited by the dissent involves the fourth *Dowthitt* situation.

trained in "behavior management and safety procedures," among other things. TEX. EDUC. CODE § 37.008(a), (a-1). The heightened disciplinary environment meant that Joshua was expected to cooperate with authority figures beyond what would be expected in a typical school. If he failed to comply, he might jeopardize his return to his usual middle school. Thus, the pressure to comply with requests from authority figures was heavier than the typical school environment.

At the disciplinary alternative school, the interview took place not outside, in a classroom, or in a school administrator's office, but in a closed-door room away from other people near the school police office. *See United States v. Chavira*, 614 F.3d 127, 134 (5th Cir. 2010) (isolation from public view in an interrogation room is a factor in determination of whether a person is in custody); *Murray v. Earle*, 405 F.3d 278, 287 (5th Cir. 2005) (child interrogated by two officers at Texas Baptist Children's home in a closed interrogation room would believe that her liberty was constrained to the degree associated with formal arrest); *In re L.M.*, 993 S.W.2d 276, 289–90 (Tex. App.—Austin 1999, pet. denied) (same).

Indeed, the setting the police chose limited Joshua's access to a trusted adult. Schools limit students' access to phones and other electronic devices that Joshua might have used to contact his mother in another environment that allowed access to those devices. Although not dispositive,[5] a juvenile's ability to consult a friendly

---

[5]    *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

18

adult is relevant because a teenager may not be able to fully appreciate what is at stake when the police seek to question him:

> [A] 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police.
>
> . . .
>
> He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14-year-old boy would not be able to know, let alone assert, such constitutional rights as he had.

*Gallegos*, 370 U.S. at 54; *see A.M. v. Butler*, 360 F.3d 787, 800–01 & nn. 10–11 (7th Cir. 2004).

No school official was present in the interview either. Even if one were present, that would not have rendered an otherwise custodial interrogation non-custodial. *See State v. D.R.*, 930 P.2d 350, 351 (Wash. Ct. App. 1997) (14-year-old interrogated by plain-clothed police officer in assistant principal's office with assistant principal and social worker and told he did not have to answer questions was still in custody); *Matter of Killitz*, 651 P.2d 1382, 1383–85 (Or. Ct. App. 1982) (junior high student's involuntary interrogation in principal's office by police officer

19

was custodial, even though principal was present). Here, Joshua could not flag down a school official or, more importantly, contact his mother on his own in this setting.

Second, the environment was dominated by police. The investigation had nothing to do with school, other than Detective Roscoe's selection of that locale for the interview and his recruitment of HISD Officer Lofton to procure Joshua. Officer Lofton removed him from class, escorted him to the school police office, and left him with two HPD officers. There was no school official there. And neither officer offered to call Joshua's mother or asked if he wanted an attorney, even though he was their prime suspect. *Cf. In re Gault*, 387 U.S. 1, 45 (1967) (when assessing the voluntariness of juvenile confessions, a court must exercise "special caution," particularly when the interrogation occurs outside the presence of a parent, lawyer, or friendly adult); *see United States v. Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012) (an in-home interrogation of an adult was custodial because it was police dominated).

Joshua was escorted by police, outnumbered by police, interrogated alone by police, and had to check in with police to leave. Even after giving the officers inculpatory statements, Joshua could not return to class without checking in with the HISD officer first, or he would get "in trouble." The police dominated the environment just as they would have an interrogation room at a police station.

20

Third, the request that Joshua answer questions was not one he would feel free to decline. With the backdrop of the compliance-inducing setting, the request from two police officers to talk to them in an isolated interrogation room was not framed as a choice with full information, but as a condition to return to class. Sergeant Holbrook asked to talk to Joshua but did not say why until after he said Joshua was not under arrest or going to jail and that he'd return to class "after the interview." Sergeant Holbrook never indicated that Joshua did not have to talk to them or could terminate the interview and return to class. Sergeant Holbrook set the parameters of the conversation before giving Joshua notice of what the conversation was about. Joshua heard "(not under) arrest," "(not going to) jail," and "change [his] life," but not "lawyer," "parent," "school administrator," or "free to leave." Sergeant Holbrook said,

- "At the end of this interview, you're going back to class."

- "We want to sit here and talk to you."

- "We don't want to take some other people's words that are putting you in something and just do something that's going to change your life."

- "We want to hear your side of the story."

That the request to interrogate was framed politely—"if you'd talk to us, that would be great"—does not give Joshua the option to leave, particularly when it was surrounded by circumstances and statements that sent the message that he could not

leave. *Cf. Cavazos*, 668 F.3d at 194 (police calling an interrogation "non-custodial" did not save it from being custodial); *In re M.A.K.*, 667 N.W.2d 467, 472 (Minn. Ct. App. 2003) (14-year-old removed from class and escorted to school police office without being told why, told he was not under arrest, but not told he could leave, nor asked if he wished to speak to his parents or return to class, and could only leave with a hall pass, was in custody). In particular, "at the end of this interview, you're going back to class," makes Joshua's exit from the interrogation room conditional on answering questions. A reasonable 14-year-old would have heard these statements when alone with police in an interrogation room away from public scrutiny and a trusted adult, and figured, I have to talk to these officers and explain myself or I'm not leaving this room, but if I explain myself, I can go back to class. *See J.D.B.*, 564 U.S. at 272 ("a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go.") And that is exactly what happened.

Viewing the evidence in the light most favorable to the trial court's denial of the motion to suppress, we find a reasonable 14-year-old in Joshua's position would not feel he "was at liberty to terminate the interrogation and leave." *See id.* at 279. Joshua was therefore in custody when he was interrogated by police and should have been brought before a magistrate and given the warnings required by Texas Family Code § 51.095. We reverse the trial court's judgment.

## Conclusion

The judgment of the trial court is reversed.

Sarah Beth Landau
Justice

Panel consisted of Chief Justice Radack and Justices Goodman and Farris.

Justice Goodman dissented.

En banc reconsideration was requested. TEX. R. APP. P. 49.7.

The en banc court consists of Chief Justice Radack and Justices Kelly, Goodman, Landau, Hightower, Countiss, Rivas-Molloy, Guerra, and Farris.

A majority of the justices of this Court voted in favor of reconsidering the case en banc.

Justice Landau writing for the majority of the en banc court, joined by Justices Kelly, Goodman, Hightower, Countiss, Rivas-Molloy, and Guerra.

Chief Justice Radack dissenting, joined by Justice Farris.

Publish. TEX. R. APP. P. 47.2(b).